**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4536**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

EDWARD JOSEPH KEHOE,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News. Robert G. Doumar, Senior District Judge. (4:16-cr-00073-RGD-LRL-1)

Argued: May 10, 2018                                      Decided: June 20, 2018

Before WILKINSON, MOTZ and KING, Circuit Judges.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Wilkinson and Judge King joined.

**ARGUED:** Caroline Swift Platt, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Richard Daniel Cooke, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Geremy C. Kamens, Federal Public Defender, Wilfredo Bonilla, Jr., Assistant Federal Public Defender, Alexandria, Virginia, for Appellant. Dana J. Boente, United States Attorney, Alexandria, Virginia, Megan M. Cowles, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.

DIANA GRIBBON MOTZ, Circuit Judge:

Edward Joseph Kehoe entered a conditional plea to being a felon in possession of a firearm, reserving the right to appeal the district court's order denying his motion to suppress. Kehoe now appeals that order. For the reasons that follow, we affirm.

I.

A.

On August 2, 2016, the Newport News Police Department received two phone calls reporting a potential issue at RJ's Sports Bar involving a man drinking while carrying a concealed firearm. Police officers went to RJ's and, after investigating, seized a gun from Kehoe's person and arrested Kehoe.

A grand jury indicted Kehoe for possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Kehoe moved to suppress the gun seized from his person and his statements to officers. He argued that the officers lacked reasonable suspicion for the seizure. At the suppression hearing, the district court admitted recordings of the two phone calls, a "call for service report," body camera footage, and a photo of the firearm recovered from Kehoe's person. The court also heard testimony from two Newport News police officers, Gary Lipscomb and E.D. Barnes. Although Kehoe called Officer Lipscomb as a witness, Kehoe did not testify or offer any other witnesses on his behalf.

According to recordings of the two phone calls, the first caller reported that he was at RJ's, and that a white male wearing "a blue-and-white striped shirt" had a gun "on his side" "under his shirt" and had "been drinking." The caller stated that he wished to be

2

anonymous, but at the 911 operator's request, provided his first name and phone number. Almost simultaneously, a second caller, an off-duty police officer, informed the police that a "bartender at RJ's" had called to inform him that a white male at RJ's was "intoxicated" and "carrying a firearm."

Based on these two phone calls, the Police Department dispatched multiple officers to RJ's, including Officers Lipscomb and Barnes. Both officers testified that RJ's was in a "known problem area." Newport News officers had previously responded to a "myriad of calls" at RJ's and in the surrounding area for incidents involving "gunshots," "intoxicated individuals refusing to leave after being kicked out of the bar," and "fights in the parking lot."

The officers did not listen to the 911 calls before entering RJ's. Instead, they reviewed a written police "call for service report." That report includes some, but not all, of the information supplied by the two callers. Specifically, it notes that the first caller, who provided his first name and telephone number, described seeing at RJ's a white male in a blue-and-white striped shirt who had a "gun on his side covered by his shirt" and was "drinking." The call for service report states that a second caller said that the RJ's bartender was concerned about a white male in unknown clothing who was carrying a firearm. The report does not indicate that the second caller was a police officer or otherwise identify him, nor does it indicate that the second caller stated that the suspect was intoxicated.

Upon arriving at RJ's, but before entering the bar, the police officers "went over some of the different code sections." Officer Lipscomb testified that, based on this review, the officers determined that under state law, persons "could be inside of a bar possessing a

3

firearm concealed if they had a concealed permit, as long as they were not drinking." *See* Va. Code § 18.2-308.012(B).

The officers then entered RJ's. Inside, Officer Lipscomb conferred with the bartender for approximately one minute. According to Officer Lipscomb, the bartender confirmed that several patrons had reported that a white male in a blue-and-white striped shirt had a gun, and that the bartender had seen a "bulge" but not the gun itself. The bartender also told Officer Lipscomb that the white man was located in the adjacent pool hall area. The officers immediately proceeded to that area where they identified the one patron — Kehoe — who matched the description of the suspect.

Officer Lipscomb approached Kehoe, who was seated at a small table near a pool table. Body camera footage shows that while speaking to Officer Lipscomb, Kehoe remained seated, leaning slightly to his left — the same side on which Officer Lipscomb was standing. Officer Lipscomb testified that Kehoe's speech was "slightly slurred." Because the confined space, loud music, and pool tables made it difficult to have a conversation, Officer Lipscomb asked Kehoe to "step outside with" the officers. When Kehoe did not comply, Officer Lipscomb asked Kehoe to "stand up" and produce identification. Kehoe did so, and two officers placed their hands on Kehoe to steer him toward the exit.

Officer Lipscomb described Kehoe's demeanor as "calm," "polite," but a bit "passive-aggressive." Officer Lipscomb also testified that he believed Kehoe's initial refusal to stand up, talk to the officers, or leave the bar indicated nervousness.

4

Once outside, the police officers testified that, among other things, Kehoe's speech was slurred and his eyes were glassy, suggesting that he had consumed alcohol. At this point, the officers handcuffed Kehoe and began a pat-down search, which revealed a handgun concealed underneath Kehoe's shirt. The police then arrested Kehoe.

B.

At the suppression hearing, the district court orally denied Kehoe's motion to suppress the challenged evidence.[1] Nine days later, the court issued a twenty-five page written opinion detailing its reasons for denying the motion. In that opinion, the court found that three categories of evidence provided the officers with reasonable suspicion sufficient to detain Kehoe briefly for investigative purposes.

First, the court found that the police dispatch was not based on a single, anonymous tip, but instead "on two 911 calls that, in combination with each other and the other factors present that night, supported reasonable suspicion." The court concluded that neither caller was anonymous, because the first caller "provided both his first name and a phone number," and "[t]he second call was from another police officer, who was reporting the concerns of the bartender and other patrons." In addition, the court found that the bartender "offered a physical description of the Defendant that matched the information in the dispatch."

---

[1] During the hearing, the district judge made a number of remarks (not repeated in its written opinion) suggesting that he found Kehoe's conduct more suspicious because of Kehoe's race. We address these remarks in Part III.

5

Second, the court noted that "[t]he officers' experience also contributed to the development of reasonable suspicion. Both Officer Lipscomb and Officer Barnes had previously responded to calls for service concerning guns, and [RJ's] was known to the Newport News Police Department for the very sort of activity the officers had received a dispatch for."

Third, the district court concluded that Kehoe's behavior "contributed to the officers' reasonable suspicion." The court explained, "When the officers approached [Kehoe], they observed him leaning to his right side (where the gun was previously reported to have been), detected the consumption of alcohol by" Kehoe, and noted Kehoe's "refusal to answer their questions." Thus, the court found that, "together with the information provided in the dispatch and the officers' previous experience with the bar, the totality of the circumstances supported reasonable suspicion of criminal activity." On these bases, the court denied Kehoe's motion to suppress.

## C.

Kehoe pled guilty to one count of being a felon in possession of a firearm, but reserved "the right to appeal the court's ruling on all grounds in his previously filed motion to suppress." The district court sentenced Kehoe to 24 months' imprisonment and two years of supervised release.

Kehoe now appeals the denial of his motion to suppress. He maintains that the police officers seized him "without a warrant and without reasonable suspicion that he had or was about to engage in criminal activity." Appellant Br. at 11. Kehoe recognizes that in assessing "a district court's decision on a motion to suppress," although we review the

6

court's "factual findings for clear error," we review its "legal conclusions de novo." *Id.*; *see United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013).

## II.

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. Amend. IV. This includes brief investigatory stops, also known as *Terry* stops. *Terry v. Ohio*, 392 U.S. 1 (1968). In assessing the constitutionality of such a stop, we ask whether, at the time of the seizure, the police officer had a "reasonable suspicion" that the person seized was "involved in criminal activity." *Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S. 177, 185 (2004).

Reasonable suspicion requires "more than an inchoate and unparticularized suspicion or hunch"; rather, the government agent must articulate a particularized, objective basis for his or her actions. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal citation and quotation marks omitted). To determine whether an officer had such a basis for "suspecting legal wrongdoing," "reviewing courts . . . must look at the 'totality of the circumstances' of each case." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

Kehoe argues that the district court erred in holding that reasonable suspicion existed at the time the police officers seized him. At the latest, as the Government acknowledges, the police seized Kehoe when two officers physically placed their hands on him. Oral Argument at 39:22–58, *United States v. Kehoe*, __ F.3d __ (4th Cir. 2018) (No. 17-4536), http://coop.ca4.uscourts.gov/OAarchive/mp3/17-4536-20180510.mp3 (counsel

7

for Government admitting that the seizure occurred when the officers "grabbed" Kehoe). By that time, the officers had told Kehoe that they suspected him of illegal activity, and Officer Lipscomb had acquired Kehoe's identification.

While we disagree with some of the district court's findings and conclusions, based on our independent review of the record, we must agree with the court's ultimate holding: the officers had reasonable suspicion of ongoing criminal activity when they seized Kehoe. *See United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005) (affirming denial of motion to suppress on different grounds); *see also Scott v. Harris*, 550 U.S. 372, 378–81 (2007) (noting in § 1983 case that where a "videotape quite clearly contradicts the version of the story" adopted by a lower court, that court erred in not viewing "the facts in the light depicted by the videotape").

To seize Kehoe, the officers needed reasonable suspicion that, while in RJ's, Kehoe was carrying a concealed handgun *and* drinking alcohol. Va. Code § 18.2-308.012(B) ("No person who carries a concealed handgun onto the premises of any restaurant or club . . . may consume an alcoholic beverage while on the premises."). The Government bears the burden of proving that reasonable suspicion justified a warrantless seizure. *McGee*, 736 F.3d at 269.[2]

---

[2] As the Government acknowledges, the district court erroneously stated that Kehoe bore "the burden of proving that the evidence should be suppressed." *See* Appellee Br. at 11. But this error provides no basis for reversal because, as Kehoe recognizes, we evaluate de novo the correctness of legal conclusions. *See* Appellant Br. at 11.

We assess the totality of the circumstances to determine if "an objectively reasonable police officer" would have had reasonable articulable suspicion that Kehoe was committing a crime at the time the officers seized him. *Ornelas v. United States*, 517 U.S. 690, 696 (1996). The Government both before the trial court and on appeal principally, but not exclusively, relies on the two telephone tips.[3]

The degree to which the police may rely on a tip to establish reasonable suspicion depends on the tipster's veracity, reliability, and basis of knowledge. *Alabama v. White*, 496 U.S. 325, 328 (1990). A tip from an anonymous caller "seldom demonstrates the informant's basis of knowledge" or contains "sufficient indicia of reliability" necessary to provide the reasonable suspicion necessary to justify a *Terry* stop and frisk. *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (quoting *White*, 496 U.S. at 327, 329) (internal quotation marks omitted). In contrast, courts generally presume that a citizen-informant or a victim who discloses his or her identity and basis of knowledge to the police is both reliable and credible. *See e.g.*, *United States v. Gomez*, 623 F.3d 265, 269–71 (5th Cir. 2010); *United States v. Elmore*, 482 F.3d 172, 180–83 (2d Cir. 2007); *United States v. Brown*, 496 F.3d

---

[3] Two factors given some weight by the district court *cannot* support a finding of reasonable suspicion here: Kehoe's posture and his alleged nervousness. Officer Lipscomb testified that he found suspicious Kehoe's leaning towards the *right*, the side on which Kehoe purportedly had a gun, but the body camera footage clearly shows that Kehoe was leaning to the *left*. Nor could Officer Lipscomb's general assertion that Kehoe seemed "nervous" establish reasonable suspicion. *See United States v. Massenburg*, 654 F.3d 480, 491 (4th Cir. 2011) (explaining that if "the ordinary response of the innocent upon being asked to consent to a search — some mild nervousness — sufficed to create reasonable suspicion, then *Terry*'s reasonable suspicion requirement would become meaningless").

1070, 1075–77 (10th Cir. 2007); *United States v. Pasquarille*, 20 F.3d 682, 689 (6th Cir. 1994).

Kehoe argues that both calls were "effectively" anonymous tips because the police did not know the identity of either caller. Kehoe is correct that the second call was anonymous. This is so because when the officers entered RJ's, their sole source of information about the two phone calls was the call for service report, which contains no information about the second caller's identity or basis of knowledge. Thus, we agree with Kehoe that the *second* caller was an anonymous source; the district court's contrary finding was clearly erroneous.

In contrast, however, the call for service report establishes that the *first* caller was *not* an anonymous source. An anonymous caller is "an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information." *J.L.*, 529 U.S. at 271. *Cf. United States v. Reaves*, 512 F.3d 123, 127 (4th Cir. 2008) (anonymous where caller did not provide name or number); *United States v. Saddler*, 275 F. App'x 549, 550–51 (7th Cir. 2008) (not anonymous where caller provided "his name and the address of his store," even though he asked to remain anonymous, refused to identify his store by name, and did not provide his phone number). Unlike the second caller and the anonymous caller in *J.L.*, the first caller does not fall into that category. *See J.L,* 529 U.S. at 270–71.

Although the first caller did not provide his full name, he provided his first name and phone number. This crucial information allowed the police to ascertain his identity. The first caller also provided the basis of his knowledge: his presence at RJ's, the location

10

of the alleged ongoing criminal activity. *See White*, 496 U.S. at 332 (indicating that reasonable suspicion requires "reason to believe not only that the caller was honest but also that he was well informed").

Thus, in determining whether the officers had reasonable suspicion that Kehoe was engaging in criminal activity, the officers were entitled to rely on the information provided by the first caller as noted in the call for service report: that a white male wearing a blue-and-white striped shirt was at RJ's, carrying a concealed weapon, and drinking. Even if that would not, standing alone, provide reasonable suspicion, the officers corroborated several key facts from the first caller's tip *before* they seized Kehoe. Officer Lipscomb learned from the bartender at RJ's that several patrons had reported that a white man in a blue-and-white striped shirt was carrying a concealed weapon. The officers then identified only one man in the bar who matched this description: Kehoe. And Officer Lipscomb observed that Kehoe's speech was "slightly slurred."

The officers also knew that RJ's was located in a "known problem area." Although "an area's disposition toward criminal activity" "carries no weight standing alone," it is "an articulable fact that may be considered along with more particularized factors to support a reasonable suspicion." *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997) (internal quotation marks and citation omitted). That the officers were responding to a situation involving an intoxicated individual and a gun — a situation not dissimilar from previous calls for service at RJ's — added to their reasonable suspicion that Kehoe was, in fact, intoxicated and in possession of weapon.

11

Given all these facts, it is clear that when the officers seized Kehoe they had a reasonable articulable suspicion that he was violating the law.[4]

III.

Finally, Kehoe contends that the district court committed reversible error in relying on Kehoe's race during the suppression hearing.

The Government maintains that the district court did not suggest "that it was suspicious that the defendant was the only white male in the pool room, but merely noted that the defendant was the only individual matching the description of the suspect." Appellee Br. at 25. We cannot agree. The court's statements during the suppression hearing seem to us to indicate that it believed Kehoe's conduct was *more* suspicious because he was of a different race than the other RJ's patrons. For example, the court told counsel to address whether "there was a reasonable suspicion of whomever that white person was *in this particular bar with the clientele that was in that bar*." And the district court repeatedly expressed concerns about why Kehoe (a white man) would go to RJ's (a bar with mostly black patrons) after midnight with a gun. The court also compared Kehoe's

---

[4] On appeal, the parties submitted in their Joint Appendix one officer's body camera footage. After oral argument, the Government moved to file a supplemental appendix containing another body camera video because, according to the Government, the video in the Joint Appendix is not the video entered into evidence before the district court. The Government also admitted, however, that "no one disputes that the video in the joint appendix is a video of the events, and . . . this Court could affirm with the record as it is now." Because Kehoe opposed the Government's motion to supplement and, because, as the Government conceded, the video in the Joint Appendix is also a video of the events in question and provides adequate evidence to affirm, we deny the Government's motion to supplement the appendix.

conduct to recent racially motivated murders of African-American churchgoers by a white man and suggested that if the officers had not arrested Kehoe, he too might have engaged in racially motivated violence.

We do not condemn the court's outrage over racially motivated violence; indeed, we share it. The desire to ensure that police can investigate and detain suspects to prevent such incidents is admirable. But the mere fact that a person of one race is present among a group that is predominantly of another race does not provide a basis of suspicion of criminal activity.[5] The district court's repeated reference to Kehoe's race during the suppression hearing was clearly improper.

Whether the court's comments during the suppression hearing provide a basis for reversal is, however, a different question. Kehoe does not offer *any* legal authority suggesting that such comments, when made during a suppression hearing, in and of themselves constitute reversible error. For several reasons, we cannot conclude that they do.

First, a motion to suppress inherently rests on the *police officers'* reasons for deciding to conduct a search or seizure. No evidence in the record indicates that the *police*

---

[5] Of course, race, like sex and national origin, commonly provides an unobjectionable basis for identity. *See, e.g.*, *Nassar v. Sissel*, 792 F.2d 119, 122 (8th Cir. 1986). And courts must also necessarily consider a party's race to evaluate claims, like those under Title VII or the Equal Protection Clause, that require assessing whether an individual is treated differently from those outside the protected class. *See, e.g.*, *Goode v. Central Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619 (4th Cir. 2015). But it is axiomatic that race alone cannot furnish reasonable suspicion of criminal activity. *See, e.g.*, *United States v. Brignoni-Ponce*, 422 U.S. 873, 884–87 (1975). The suggestion that someone is more likely to engage in a crime because of his or her race is equally impermissible.

13

*officers* impermissibly considered Kehoe's race in their reasonable suspicion analysis. *Cf. United States v. Brignoni-Ponce*, 422 U.S. 873, 884–87 (1975) (finding that Border Patrol officers lacked reasonable suspicion for a stop where they relied on only "the apparent Mexican ancestry" of the persons stopped). Indeed, Kehoe makes no argument that the *officers* improperly considered his race.

Furthermore, in this case, we can view detailed video and telephone recordings of the events in question. Such recordings always provide important advantages to reviewing courts. *See Scott*, 550 U.S. at 378 (reversing because a "videotape quite clearly contradict[ed]" the lower court's findings). They are particularly important here, as our review of the recordings, call for service report, and body camera footage enables us to independently assess the facts in question and to affirm on the basis of our assessment, not that of the district court.[6]

Nor does the record suggest that the court's remarks interfered with Kehoe's ability to obtain a fair hearing. Such remarks before a *jury* could well have interfered with the jury's ability to be impartial. But the district court made its comments during a suppression hearing with no jury present. *See United States v. Lefsih*, 867 F.3d 459, 467 (4th Cir. 2017) (noting that the concern in cases alleging judicial bias or interference "is not necessarily with the content of the court's questions or comments, but rather that the jury may infer

---

[6] The only determinations by the district court on which we need rely are those regarding witness credibility. Two witnesses testified at the suppression hearing: Officers Lipscomb and Barnes. Kehoe did not present any witnesses or evidence that undermined their credibility, nor does he does contend on appeal that race in any way affected the district court's credibility determinations.

14

from the very fact of repeated interventions or interruptions that the court is sympathetic to one side of the case"). Kehoe does not maintain that the court's conduct "impermissibly interfered with the manner in which [he] sought to present his evidence," *United States v. Martinovich*, 810 F.3d 232, 240 (4th Cir. 2016), and his trial counsel did not object to these statements at any point during the suppression hearing.

In sum, racial remarks like those at issue here have no place in our judicial system, and we do not in any way condone them. But our independent review of the record — particularly the video and telephone recordings — establishes that in this case, the district court's references to Kehoe's race at the suppression hearing did not prejudice him, and so do not require reversal.

IV.

For the reasons set forth within, the judgment of the district court is

*AFFIRMED*.