**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 22-4063**

───────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

DANIEL PORTER CRITCHFIELD,

Defendant – Appellant.

───────────

Appeal from the United States District Court for the Northern District of West Virginia, at Clarksburg.  Irene M. Keeley, Senior District Judge.  (1:20-cr-00040-IMK-MJA-1)

───────────

Argued:  January 24, 2023                               Decided:  August 31, 2023

───────────

Before HARRIS, RICHARDSON, and RUSHING, Circuit Judges.

───────────

Vacated and remanded by published opinion.  Judge Rushing wrote the opinion, in which Judge Harris joined.  Judge Richardson wrote a dissenting opinion.

───────────

**ARGUED:**  Linn Richard Walker, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Clarksburg, West Virginia, for Appellant.  Sarah Wagner, OFFICE OF THE UNITED STATES ATTORNEY, Clarksburg, West Virginia, for Appellee.  **ON BRIEF:**  William Ihlenfeld, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

───────────

RUSHING, Circuit Judge:

Daniel Critchfield pled guilty to possessing a firearm as an unlawful drug user after the district court denied his motion to suppress the firearm and other evidence as the products of an unlawful seizure. Because the officers lacked reasonable suspicion of criminal activity when they first detained Critchfield, we vacate his conviction and remand for further proceedings.

## I.

On Thursday, February 25, 2016, around 8:00 or 8:30 a.m., United States Postal Inspector Charles Gerhart stepped out the front door of his house on Fifth Street in Bridgeport, West Virginia, to go to work. Gerhart saw a man, later identified as Critchfield, walking onto Fifth Street out of the alley that connects Fifth Street to the employee parking lot behind Oliverio's Ristorante. Adjacent to the alley was a house that Gerhart believed was unoccupied at the time. Critchfield and Gerhart made eye contact, and Gerhart thought Critchfield had an "Oh, no, I'm caught" look on his face. J.A. 167. Critchfield turned left on Fifth Street and walked away from Gerhart toward Grand Avenue. As Gerhart walked to his car, he watched Critchfield, who repeatedly looked over his shoulder toward Gerhart. Finding this suspicious, Gerhart drove his personal vehicle up Fifth Street toward Grand Avenue, following Critchfield. When he turned right on Grand Avenue, Gerhart saw Critchfield doubling back toward Fifth Street. Gerhart also noticed that the front pocket of Critchfield's hooded sweatshirt "had what appeared to be something very heavy in it, so heavy that it was falling down below his crotch." J.A. 170.

2

Gerhart then called Deputy Chief Randy Hartley of the Bridgeport Police Department. In his role as a federal postal inspector, Gerhart sometimes worked with local police, including Hartley, and knew how to contact him directly. Gerhart reported that he had seen "a suspicious subject" in his neighborhood and described Critchfield's appearance and location. J.A. 175. Gerhart told Hartley he saw the subject come out of the alley near an occasionally unoccupied house, the subject kept looking at him, and when Gerhart followed the subject in his car, he found him "walking back the direction he just came from." J.A. 176. He also told Hartley that the pocket of the subject's sweatshirt was "so heavy that the shirt was hanging down below his crotch." J.A. 176.

Hartley and Lieutenant Mike Lemley responded to the call and found Critchfield walking away from the area, along Airport Road just off Route 50 near Glotfelty Tire Center. They motioned to Critchfield and activated their vehicle's rear emergency lights while pulling over behind him off the side of the road. Critchfield complied with the officers' commands. Officers discovered Critchfield had been carrying in his sweatshirt pocket a holstered pistol, a flashlight, and a small silver container holding six buprenorphine pills, one hydrocodone pill, one Xanax, and one dextroamphetamine pill. Critchfield had benzodiazepines, THC, and amphetamines in his system at the time.

A federal grand jury indicted Critchfield for possessing a firearm while being an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3). Critchfield moved to suppress the firearm and other physical evidence, arguing that the officers lacked reasonable suspicion for the stop. After the district court denied his motion, Critchfield entered a conditional guilty plea that preserved his right to appeal the suppression ruling.

3

II.

On appeal from a district court's denial of a motion to suppress, "[w]e review de novo the ultimate legal conclusion of whether reasonable suspicion existed to justify police action." *United States v. McCoy*, 513 F.3d 405, 410 (4th Cir. 2008). We review factual findings for clear error, and because the Government prevailed below, we construe the evidence in the light most favorable to it. *United States v. Foster*, 824 F.3d 84, 88 (4th Cir. 2016).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. A police officer may conduct a "brief investigatory stop" consistent with the Fourth Amendment if "the officer's action is supported by a reasonable and articulable suspicion . . . that criminal activity may be afoot." *Foster*, 824 F.3d at 88 (internal quotation marks omitted); *see Terry v. Ohio*, 392 U.S. 1, 30 (1968). Reasonable suspicion "is a less demanding standard than probable cause" yet requires "at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The burden is on the Government to prove that reasonable suspicion justified a warrantless seizure. *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018).

A few features of reasonable suspicion are particularly salient here. The suspicion must be articulable—that is, "[t]he officer must be able to articulate" objective reasons for his suspicion. *Wardlow*, 528 U.S. at 123–124. A mere "'hunch'" or "'inchoate and unparticularized suspicion'" will not do. *Id.* at 124 (quoting *Terry*, 392 U.S. at 27); *see United States v. Gist-Davis*, 41 F.4th 259, 264 (4th Cir. 2022). At the same time, we give

4

"due weight" to the inferences and "common sense judgments reached by officers in light of their experience and training" in identifying suspicious circumstances that may appear unremarkable to a layman. *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004); *see Ornelas v. United States*, 517 U.S. 690, 699 (1996); *McCoy*, 513 F.3d at 414. "Facts innocent in themselves may together amount to reasonable suspicion." *United States v. Mitchell*, 963 F.3d 385, 390 (4th Cir. 2020); *see United States v. Sokolow*, 490 U.S. 1, 9–10 (1989).

The suspicion also must be particularized; an investigatory stop must be justified by an objective basis to suspect that the particular person stopped is, or is about to be, "engaged in a particular crime." *Kansas v. Glover*, 140 S. Ct. 1183, 1190 n.1 (2020); *see United States v. Cortez*, 449 U.S. 411, 417 (1981). The Government asserts that the suspected crime here is theft, not the firearm offense for which Critchfield was ultimately indicted.[1] So we focus on whether the officers had reasonable suspicion to believe Critchfield had committed or was poised to commit a theft.

In making this assessment, we consider the totality of the circumstances to determine whether the facts known to the officers at the time of the stop objectively gave rise to reasonable suspicion. *See Glover*, 140 S. Ct. at 1188; *Sokolow*, 490 U.S. at 8; *Walker v. Donahoe*, 3 F.4th 676, 682 (4th Cir. 2021). The district court here found that "Critchfield

---

[1] As Lemley testified at the suppression hearing, when the officers stopped Critchfield, it was legal to carry a concealed firearm with a permit in West Virginia and the officers had no reason to suspect Critchfield lacked a permit. Nor does the Government claim the officers had reason to suspect Critchfield was an illegal user of controlled substances.

5

was detained when he complied with Hartley's directive to move to the side of Airport Road," and neither party challenges that holding on appeal. J.A. 260. At the time Hartley directed Critchfield to the side of Airport Road, Hartley and Lemley had not observed anything or acquired any firsthand knowledge that contributed to their suspicion. Their ground for stopping Critchfield was based entirely on the information Gerhart had communicated to them. Although Gerhart worked in law enforcement, he did not make the stop or instruct these officers to do so. Rather, as the parties appear to agree, Gerhart acted as a known and credible tipster. We therefore focus on the facts known to Hartley and Lemley, not Gerhart, at the time they stopped Critchfield.

Considering the totality of the circumstances known to Hartley and Lemley when they stopped Critchfield, we conclude they did not have objectively reasonable suspicion that he was, or had been, engaged in theft. Gerhart told Hartley he saw a man he didn't recognize exit an alley onto his street around 8:30 a.m. This portion of the mixed-use neighborhood was largely residential but adjacent to "dense, higher-traffic, and commercial areas." J.A. 222. A house near the alley was occasionally unoccupied, and the man had something heavy in his sweatshirt pocket. As the man walked up the street, he kept glancing back at Gerhart and, after making a right turn onto another street, he eventually doubled back and retraced his steps. Gerhart lost track of the man, and Hartley and Lemley found him walking along the road in an adjacent commercial area. To summarize, when the officers stopped Critchfield, they knew he was a man with a weighed-down sweatshirt pocket who had walked through a residential neighborhood past an occasionally unoccupied home next to a commercial area in broad daylight and who had

6

behaved evasively when a neighborhood resident watched and followed him. These circumstances, without more, do not give rise to reasonable suspicion of theft.

The Government attempts to bolster its showing by citing other cases where suspicion rested on similar factors. But those cases only highlight the dearth of reasonable, articulated suspicion here.

For example, the Government notes Critchfield's evasive reaction to Gerhart and observes that we have repeatedly held a defendant's attempt to evade law enforcement can support reasonable suspicion. *See*, *e.g.*, *United States v. Bumpers*, 705 F.3d 168, 175 (4th Cir. 2013) (walking away at a fast pace upon noticing a patrol car); *United States v. Smith*, 396 F.3d 579, 584–585 (4th Cir. 2005) (attempting to evade a police roadblock); *United States v. Sims*, 296 F.3d 284, 287 (4th Cir. 2002) (hiding behind a building and jerking back out of view after making eye contact with a police officer); *see also Wardlow*, 528 U.S. at 124 ("[h]eadlong flight" upon noticing the police). But Critchfield's nervous and arguably evasive reaction was not in response to an identifiable member of law enforcement. Nothing in the record suggests Gerhart was in uniform or recognizable as a federal postal inspector when Critchfield saw him. Depending on the circumstances, it may be significantly less indicative of criminal activity for a person to evade a stranger on the street than to evade the police. While headlong flight might provoke suspicion in any context, we think a nervous reaction and evasive route in response to being watched and followed by another civilian contributes less support to a finding of reasonable suspicion than efforts to evade law enforcement.

7

To take another example, the Government relies on Critchfield's sagging sweatshirt pocket, suggesting officers could reasonably believe it contained theft implements or stolen goods. However, no officer articulated a reason to think the pocket itself suspicious; there was no testimony, for example, about the shape of any bulge in the pocket, anything protruding from it, any expectation about how thieves typically carry theft implements, or any recent thefts of objects of a particular size or weight. *Cf.*, *e.g.*, *United States v. Black*, 525 F.3d 359, 365 (4th Cir. 2008) (considering officer's testimony that he saw "a bulge which was '6 to 8 inches long along the bottom of the pocket,' '1 to 1 ½ inches high,' and 'appeared to have a flat side,'" which he suspected was a firearm). In fact, Lemley testified that a hooded sweatshirt with a bulge in these circumstances "could be any number of things" and he "d[id]n't know, you know, what it could have been, until [they] were able to locate him." J.A. 190.

Apparently seizing on this uncertainty, the Government cites cases about frisking a suspect for officer safety after a stop based on reasonable suspicion. But those authorities miss the mark here, because the Government is relying on the heavy pocket to justify suspicion of criminal activity, not as reason to believe a lawfully stopped suspect was armed and dangerous. *See United States v. Robinson*, 846 F.3d 694, 698 (4th Cir. 2017) (en banc) (faulting defendant for "collaps[ing] the requirements for making a stop with the requirements for conducting a frisk").

The only basis for thinking Critchfield's heavy pocket held theft implements or stolen valuables was his temporary proximity to the occasionally unoccupied house by the alley at 8:30 a.m. Gerhart did not tell the officers that Critchfield had been in the house or

8

on the property, that he emerged from behind it, or that he appeared to be casing it. *Cf. Terry*, 392 U.S. at 6, 28, 30 (experienced officer testified that suspects' behavior around a store was consistent with "casing a job"). Rather, he walked out of an alley beside the house that connected Fifth Street to a commercial area. In these circumstances, the heavy pocket contributes to the overall picture but does not independently lend much support to an objective basis for reasonable suspicion.

Of course, we must not discount the officers' experience and training "to detect the nefarious in the mundane." *McCoy*, 513 F.3d at 415. But, unlike in many cases, here no officer testified to any specialized basis he had for interpreting these circumstances as indicative of criminal activity, like a common criminal modus operandi or a location with frequent thefts. *See*, *e.g.*, *id.* at 413; *Perkins*, 363 F.3d at 321–322; *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993). And while we give due weight to an officer's commonsense judgments and inferences from the facts, *see Glover*, 140 S. Ct. at 1189, we do not defer to an officer's inchoate sense of suspicion. Thus, Gerhart's identification of Critchfield to Hartley as "a suspicious subject" does not contribute to the calculus apart from articulable facts to support that suspicion. J.A. 175. Nor may we supplement the Government's showing with our own "imagin[ed] . . . conceivable justification[s]" for the officers' actions; unlike rational basis review, reality matters for reasonable suspicion. *Doe v. Settle*, 24 F.4th 932, 943–944 (4th Cir. 2022); *but see* Dissenting Op., *infra*, at 12.

At bottom, the totality of the circumstances does not support a reasonable, articulable suspicion that Critchfield had engaged, or was about to engage, in theft. Although facts "susceptible of innocent explanation" can, "[t]aken together," amount to

9

reasonable suspicion, the facts here do not reveal a particularized and objective basis for suspecting legal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 277 (2002). When the officers stopped Critchfield in a commercial area, they knew he previously had walked through an adjacent residential neighborhood past an occasionally unoccupied home around 8:30 a.m., carried something heavy in his sweatshirt pocket, and had behaved evasively when a neighborhood resident watched and followed him. Without more, these circumstances do not establish reasonable suspicion that Critchfield had committed a theft or was about to do so.

III.

For these reasons, the district court should have granted Critchfield's motion to suppress. We therefore vacate Critchfield's conviction and remand the case for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

RICHARDSON, Circuit Judge, dissenting:

"To be reasonable is not to be perfect . . . ." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). So demonstrating reasonable suspicion is not hard. All we require is that an officer point to the specific, objective facts that made him suspect criminal activity. *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). To help himself get over this (decidedly low) hump, the officer may also describe any inferences he drew—based on his training and experience—that informed his suspicion, even if they might not be readily apparent to us. *United States v. Johnson*, 599 F.3d 339, 344 (4th Cir. 2010). And in deciding whether those facts and inferences add up to a reasonable suspicion, we take a practical approach— acknowledging that suspicion arises from everyday considerations rather than after-the-fact, judge-identified conditions. *See Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (suspicion arises from "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act" (quoting *Navarette v. California*, 572 U.S. 393, 402 (2014))).

After finishing the majority opinion, a reader could be forgiven for getting that last part backwards. My colleagues mechanically march through caselaw, correctly noting differences between past cases and Critchfield's circumstances, and incorrectly holding these differences fatal to the officer's judgment. But this procession of distinguishments is far more at home in a qualified-immunity analysis than a reasonable-suspicion inquiry. Reasonable suspicion doesn't require each fact or inference the officer relies on be a clearly established "suspicion indicator" in our Circuit before he relies on it. *See Ornelas v. United States*, 517 U.S. 690, 698 (1996) ("[B]ecause the mosaic which is analyzed for a

11

reasonable-suspicion or probable-cause inquiry is multi-faceted, one determination will seldom be a useful precedent for another." (cleaned up) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 n.11 (1983))).  He just needs his logic to make some sense.  *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (Reasonable suspicion requires only "a *minimal level* of objective justification for making the stop." (emphasis added)).  In short, reasonable suspicion is a little less qualified immunity and a little more rational basis than the majority lets on.

With that in mind, I would hold that Deputy Chief Hartley reasonably suspected Critchfield might be engaged in criminal activity.  Don't let the majority's positive spin on Critchfield's behavior fool you; if you scratch off the rose-colored tint, the officer's concerns come into view.  Deputy Chief Hartley got a call around 8:00 am from an old law enforcement colleague—someone he knew had experience investigating crime— telling him something was amiss in his neighborhood.  Gerhart told him that he had seen a man he did not know at the mouth of an alleyway next to a vacant house.  Gerhart then reported the man's evasive behavior and the fact that his sweatshirt pocket was "so heavy that the shirt was hanging down below his crotch."  J.A. 176.

So Deputy Chief Hartley knew that an unidentified man had been spotted leaving the vicinity of a vacant house early in the morning, with his pocket significantly weighed down, and trying to avoid observation even from fellow civilians.  Deputy Chief Hartley also knew that this man had spooked a fellow law enforcement officer to the point that Gerhart abandoned his morning plans, followed the man, and called Hartley after watching the man double back towards the vacant house.  This might not look like much to the

12

majority.  It might not even look like all that much to me.  But it is enough to raise a reasonable suspicion that the man may have been stealing, or planning to steal, from the empty home, and thus to justify Deputy Chief Hartley investigating further to make sure all was well.  Since that's all the Fourth Amendment requires for a brief stop, I respectfully dissent.