**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-4654**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JAMES ANTHONY MITCHELL,

Defendant - Appellant.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington. Robert C. Chambers, District Judge. (3:13-cr-00331-1)

Argued: October 31, 2019                     Decided: June 30, 2020

Before WYNN, QUATTLEBAUM, and RUSHING, Circuit Judges.

Affirmed by published opinion. Judge Rushing wrote the majority opinion, in which Judge Quattlebaum joined. Judge Wynn wrote a dissenting opinion.

**ARGUED:** Jonathan D. Byrne, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant. Joseph Franklin Adams, OFFICE OF THE UNITED STATES ATTORNEY, Huntington, West Virginia, for Appellee. **ON BRIEF:** Christian M. Capece, Federal Public Defender, George H. Lancaster, Jr., Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant. Michael B. Stuart, United States Attorney, OFFICE OF UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

RUSHING, Circuit Judge:

James Anthony Mitchell was charged with possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Following the district court's denial of Mitchell's motion to suppress the firearm, Mitchell entered a conditional plea of guilty. Mitchell appeals the district court's suppression ruling, arguing that the officer who stopped and frisked him lacked reasonable suspicion. For the reasons that follow, we affirm the judgment of the district court.

I.

A.

Shortly after closing time on April 7, 2013, officers with the Huntington Police Department were dispatched to "Rehab," a Huntington, West Virginia bar, in response to a report of a large fight, an assault, and a person with a gun. An officer quickly arrived on the scene, and a bystander informed him that a black man wearing red pants and a black shirt had a gun and was leaving the scene walking eastbound on Fourth Avenue. Another officer heard this report and, within one minute, saw a man matching the description: Mitchell. The officer stopped and frisked Mitchell, found a firearm on his person, and took him into custody.

A federal grand jury indicted Mitchell for possession of a firearm by a felon, based on state felony convictions he had incurred one month before the incident, and the district court issued a warrant for his arrest. Four years later, in May 2017, Mitchell was arrested on the warrant. Mitchell moved to suppress the gun seized from his person. At a suppression hearing on October 16, 2017, the district court admitted the computer-aided

2

dispatch (CAD) sheet associated with the incident and a map of the area. The court also heard testimony from three Huntington police officers: Officer Robert Black, Corporal Jacob Felix, and Corporal Benjamin Howard.[1]

Evidence at the hearing showed that Jim Smith, who Corporal Howard knew to be either an employee or regular patron at Rehab, called 911 to report a large fight in the bar's parking lot after 3:00 a.m. on April 7, 2013. Huntington police officers knew Rehab, which was located at the corner of Twelfth Street and Fourth Avenue, as a location where disturbances frequently occurred; indeed, officers were regularly dispatched to Rehab and surrounding bars around the 3:00 a.m. closing time.

Dispatch entered Smith's call on the CAD sheet at 3:11:29 a.m. Officer Black testified that a CAD sheet records information about a call to the police department and the narrative section of a CAD sheet notes the information that is being relayed from dispatch over the radio to the officers. The narrative section of the CAD sheet logged at 3:11:57 and 3:12:06 stated: "IN THE [PARKING] LOT ADV[ISED] ABOUT 30 PEOPLE INVOLVED / ADV[ISED] HEARD SOMEONE SAY THEY HAD A GUN." J.A. 139. A few seconds later, at 3:12:38, the narrative upgraded the call from reporting merely a fight to reporting an "assault victim." J.A. 139.[2] As the narrative stated at 3:13:00:

---

[1] The CAD sheet indicates that three other officers also reported to the scene. We do not have information about who these officers stopped or spoke to, or what they did at the scene.

[2] We use the term "assault" throughout this opinion in the same sense as the CAD sheet uses it: to refer to a use of force against the body of another person.

3

"ADV[ISED] ONE SUSP[ECT] KNOCKED OUT LAYING ON THE GROUND." J.A. 139.

Corporal Howard arrived at the bar by 3:16:51. While Officer Black was en route, he heard Corporal Howard advise over the radio that a bystander at the scene had informed him that "a male with red pants, black shirt, a black male had a firearm on him and was walking eastbound on 4th Avenue" away from Rehab. J.A. 45. Within one minute of hearing this report, Officer Black saw Mitchell, who matched the description precisely, walking eastbound on Fourth Avenue approaching Thirteenth Street, within one block of Rehab. Officer Black immediately stopped his police cruiser, pulled his service weapon, and ordered Mitchell to put his hands on his head.

Corporal Felix, who also was headed to the scene, saw Officer Black pull his cruiser over to the curb near Thirteenth Street "basically as soon as the radio was cleared" from relaying Corporal Howard's description of the armed suspect wearing red pants and a black shirt. J.A. 72. Corporal Felix saw Mitchell walking eastbound on Fourth Avenue. He testified that Mitchell's pants were "very bright red," that he did not see anyone else with red pants, and that there were no other pedestrians near Mitchell. J.A. 73. Corporal Felix stopped to assist Officer Black. Officer Black patted Mitchell down and discovered a revolver in his waistband. After securing Mitchell, Officer Black called dispatch to report the gun's serial number. Dispatch recorded Officer Black's call at 3:20:27, within nine minutes of the original 911 call.

Corporal Howard testified that he routinely responded to disturbances at Rehab and he had no doubt he was at the scene on April 7, 2013, based on the CAD sheet and

4

testimony from the other officers. However, because the incident occurred four-and-a-half years before the suppression hearing, Corporal Howard could not specifically remember the night in question. When asked about the CAD sheet, Corporal Howard testified that he knew the original caller, Jim Smith, who was a regular at Rehab and may have been an employee at one time. But Corporal Howard could not recall who at the scene gave him the description of the suspect that he broadcast over the radio to the other officers.

B.

A week after the evidentiary hearing, the district court held a second hearing at which it heard argument on the motion to suppress. After receiving supplemental briefing from the parties following the hearing, the district court issued a written decision denying the motion on December 1, 2017. Relying in part on this Court's decision in *United States v. Christmas*, 222 F.3d 141 (4th Cir. 2000), the district court reasoned that the bystander's description to Corporal Howard "had more credibility than a purely anonymous phone tip" and, combined with the totality of the evidence, satisfied the Government's burden to demonstrate that Officer Black acted with reasonable suspicion when he stopped Mitchell. J.A. 183.

After the denial of his motion to suppress, Mitchell pleaded guilty to one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), but reserved the right to appeal the district court's suppression ruling. The court sentenced Mitchell to 30 months' imprisonment and three years of supervised release. Mitchell timely appealed.

II.

When assessing a district court's ruling on a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). Where, as here, the Government prevailed on the motion in the district court, we construe the evidence in the light most favorable to the Government. *United States v. Seidman*, 156 F.3d 542, 547 (4th Cir. 1998).

A.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. Under well-established doctrine, a police officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop—known as a "*Terry* stop"—predicated on reasonable, articulable suspicion that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *see Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Reasonable suspicion is "a less demanding standard than probable cause" but requires "at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123. "The Government bears the burden of proving that reasonable suspicion justified a warrantless seizure." *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018).

In evaluating the validity of a *Terry* stop, we must consider "the totality of the circumstances—the whole picture." *United States v. Sokolow*, 490 U.S. 1, 8 (1989) (internal quotation marks omitted). "The principal components of a determination of reasonable suspicion . . . will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *Ornelas*, 517 U.S

6

at 696. Facts innocent in themselves may together amount to reasonable suspicion; officers are permitted to conduct investigative stops "based on what they view as suspicious—albeit even legal—activity." *United States v. Perkins*, 363 F.3d 317, 326 (4th Cir. 2004); *see Terry*, 392 U.S. at 22–23. And because reasonable suspicion is a less demanding standard, it can arise "from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990).

Our determination of reasonable suspicion must give due weight to "commonsense judgments and inferences about human behavior" made by officers in light of their experience and training. *Wardlow*, 528 U.S. at 125; *see Perkins*, 363 F.3d at 321. "The standard 'depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (emphasis omitted) (quoting *Navarette v. California*, 572 U.S. 393, 402 (2014)). Thus, while we require "more than an 'inchoate and unparticularized suspicion or hunch,'" *Wardlow*, 528 U.S. at 124 (quoting *Terry*, 392 U.S. at 27), we also "credit[] the practical experience of officers who observe on a daily basis what transpires on the street," *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993).

B.

Considering the totality of the circumstances, we conclude that Officer Black had reasonable suspicion of criminal activity when he stopped Mitchell. Jim Smith, a Rehab employee or regular patron known to Corporal Howard, had called 911 to report a large fight and assault, with a victim "KNOCKED OUT LAYING ON THE GROUND." J.A. 139; *see* W. Va. Code § 61-2-9 (West Virginia's criminal assault and battery statute); W.

7

Va. Code § 61-6-1b(a) (West Virginia's criminal disorderly conduct statute). Smith had given dispatch his name and telephone number. *See Kehoe*, 893 F.3d at 239 (caller disclosed his first name and telephone number, which supported the reliability of his tip). Officers knew that Rehab was a problem area, especially at this late hour when the bars were emptying. *See id.* (noting that bar's reputation as a "known problem area" added to the officers' reasonable suspicion); *cf. Wardlow*, 528 U.S. at 124 ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime[,] [b]ut officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." (internal citation omitted)). In connection with the fracas, Smith had reported that "SOMEONE SA[ID] THEY HAD A GUN." J.A. 139. The officers heard this information from dispatch on their radios and could reasonably infer from the report that the person with the gun was involved in the fight. Corporal Howard arrived on the scene within four or five minutes, and a bystander informed him that "a male with red pants, black shirt, a black male had a firearm on him and was walking eastbound on 4th Avenue" away from Rehab. J.A. 45. The bystander's tip corroborated Smith's report to dispatch that someone in the altercation said they had a gun. Officer Black heard Corporal Howard's description of the suspect with the gun and within one minute saw Mitchell, wearing red pants and a black shirt, walking eastbound on Fourth Avenue within a block of Rehab, as the bystander had predicted. *See White*, 496 U.S. at 330–331 (discussing the importance of corroboration in establishing the reliability of an anonymous tip). On these facts, it was entirely reasonable

for Officer Black to stop Mitchell based on suspicion that he had been involved in the fight and assault at Rehab and, after stopping him, to frisk him for weapons on the reasonable belief that he was armed and dangerous.[3] Put simply, "police observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch." *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003).

Moreover, Officer Black was justified in relying on the bystander's tip as communicated by Corporal Howard as part of his basis for reasonable suspicion. Officer Black understood that Corporal Howard was at the scene of the assault, the Rehab parking lot, when he received the description of the person with a gun from a bystander. J.A. 45, 49. The basis of the bystander's knowledge—his or her presence at the location of the fight—strongly supported the tip's reliability. *See Kehoe*, 893 F.3d at 239 (tipster's presence at "the location of the alleged ongoing criminal activity" provided basis of knowledge supporting reliability); *cf. Illinois v. Gates*, 462 U.S. 213, 234 (1983) (a tipster's "statement that the event was observed first-hand[] entitles his tip to greater weight"). The bystander provided the description to a police officer in person and in public, in close proximity to the alleged criminal activity and to Mitchell, all of which support the bystander's veracity and enhance the reliability of the bystander's tip. *See United States v. Griffin*, 589 F.3d 148, 152–153 (4th Cir. 2009) (noting, as factors in assessing an informant's reliability, his "proximity to the reported activity," "whether the informant

---

[3] Mitchell does not challenge the search of his person for weapons separate from the stop, so we address only the constitutionality of the initial stop.

reported to the police in public," and "whether the officer had the opportunity to observe the informant's credibility and demeanor"); *see also Christmas*, 222 F.3d at 144.

As previously observed, based on the information officers had received from dispatch, they could reasonably infer that a person with a gun was involved in the fight and potentially the assault. The bystander's subsequent report implicating a man with a gun therefore was independently corroborated by the 911 call. And Officer Black verified multiple aspects of the tip before stopping Mitchell, namely the direction in which he was traveling, his mode of transportation, his proximity to Rehab, and his physical description, including his distinctive red pants. *See White*, 496 U.S. at 331 (emphasizing the importance of corroborative efforts by officers). The totality of the circumstances supported Officer Black's decision to stop Mitchell.

### III.

Mitchell makes two arguments challenging this conclusion. First, he argues that the description the bystander provided to Corporal Howard was unreliable because the bystander was an anonymous tipster, relying on *Florida v. J.L.*, 529 U.S. 266 (2000), and *Alabama v. White*. Second, he contends that, even if the tip were reliable, it did not sufficiently allege illegal conduct. Neither argument is persuasive.

### A.

Mitchell argues that the bystander's description in this case is analogous to the anonymous tips in *J.L.* and *White*. In *J.L.*, police received a "call made from an unknown location by an unknown caller" stating that a young black male wearing a plaid shirt and standing at a particular bus stop was carrying a gun. 529 U.S. at 268, 270. Sometime after

10

receiving the tip, officers arrived at the bus stop and frisked the three black males standing there, one of whom was wearing a plaid shirt. *Id.* at 268. The Supreme Court held that the officers lacked reasonable suspicion for the search because the anonymous tip, which was the sole basis on which the officers relied, lacked indicia of reliability. *Id.* at 271. "[N]othing [wa]s known about the informant" or his or her basis of knowledge, the tip did not supply any predictive information by which police could verify the informant's knowledge or credibility, and neither the tip nor the officers' observations provided a reliable basis to believe criminal activity was afoot. *Id.* at 268, 271–272.

In *White*, an anonymous person called police to report that the defendant was in possession of an ounce of cocaine. 496 U.S. at 327. The anonymous caller provided details about the apartment building the defendant would exit, the vehicle she would drive, and the direction she would go, all of which the officers corroborated by observation before they stopped the defendant's car. *Id.* at 331. The Supreme Court held that reasonable suspicion supported the stop, emphasizing that the tip contained details related "to future actions of third parties ordinarily not easily predicted." *Id.* at 332 (internal quotation marks omitted). As the Court explained, although "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," even an anonymous tip, suitably corroborated, can exhibit "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Id.* at 327, 329.

The Government responds that *J.L.* and *White* are inapposite because the tipster here was face-to-face with Corporal Howard, unlike the anonymous callers in those cases. We have had many occasions to address the difference between anonymous tipsters and face-

11

to-face informants. "An anonymous caller is 'an unknown, unaccountable informant who neither explain[s] how he kn[ows] about [the alleged illegal activity] nor supplie[s] any basis for believing he ha[s] inside information." *Kehoe*, 893 F.3d at 238 (quoting *J.L.*, 529 U.S. at 271). "[F]ace-to-face encounters with informants are altogether different from anonymous tips" because they typically provide a measure of accountability and an opportunity to evaluate the informant's credibility and demeanor. *Christmas*, 222 F.3d at 143–144.[4] For example, in *Christmas*, we held that that an unsolicited in-person tip from an unnamed, intoxicated woman who indicated that her neighbor two houses down had drugs and guns was sufficiently reliable to support a *Terry* stop. *Id.* at 143. We reasoned that the informant's credibility was bolstered by the close proximity of her home to the alleged illegal activities—suggesting a basis for knowledge—and her proximity to the alleged illegal activities when she reported the information to the police in public, thereby exposing herself to the risk of reprisal. *Id.* at 144. We also noted that, unlike an anonymous tipster, "a witness who directly approaches a police officer can . . . be held accountable for false statements." *Id.*

We applied these principles again in *United States v. Griffin* to hold that an unnamed informant's tip was sufficiently reliable for reasonable suspicion. There, someone called 911 from a motel in a high-crime area reporting a man with a gun. 589 F.3d at 150. A

---

[4] *See also United States v. DeQuasie*, 373 F.3d 509, 523 (4th Cir. 2004) (distinguishing anonymous tips from face-to-face encounters); *United States v. Heard*, 367 F.3d 1275, 1279 (11th Cir. 2004) ("A face-to-face anonymous tip is presumed to be inherently more reliable than an anonymous telephone tip because the officers receiving the information have an opportunity to observe the demeanor and perceived credibility of the informant.").

police officer arrived at the motel room from which the call was made, and an occupant of the room, who was aware of the 911 call, identified a man driving past the motel in a white Cadillac as the man with the gun. *Id.* at 150–151. Another officer pursued and stopped the Cadillac and eventually found a gun in the passenger compartment. *Id.* at 151. We considered numerous factors in determining that the officers had reasonable suspicion to effect a *Terry* stop, including: the officers had the opportunity to observe the informant's credibility and demeanor; "[h]aving observed the informant's physical appearance and location, the officers could have . . . tracked him down to hold him accountable if his accusations had proven false"; the informant met with police in public, thereby exposing himself to potential retaliation from the defendant; the informant was in close proximity to the reported activity; and one of the officers had personal experience investigating similar activity at the motel. *Id.* at 152–153.

Further, in *United States v. Perkins*, we upheld a *Terry* stop when an unidentified woman called police to report two white men, who had arrived in a red car with a white stripe, pointing and displaying rifles in various directions in a high-crime residential area. 363 F.3d. at 319–320. When officers arrived, they saw two men in the described car, including a "known drug taker"; when the car began to drive off, officers initiated a traffic stop. *Id.* at 320. There was some question whether the call was truly anonymous, because an officer believed the woman might be a neighbor who had called several times previously and given reliable information. *Id.* at 323. But, even assuming the tip was anonymous, and even without the opportunity to assess the tipster's credibility face-to-face, we concluded that the officers had reasonable suspicion to stop the vehicle, because the tip

13

made clear that the caller was in close proximity to the reported activity and had personally observed both men, and the officer confirmed the tip's reliability with his own knowledge of the area and observations upon arriving at the scene. *Id.* at 324.

In light of our precedent, the facts of this case presented officers with a face-to-face informant, not an anonymous tipster, and the informant was sufficiently reliable to supply part of the ground for the officers' reasonable suspicion. The informant here was not an "unknown caller" at an "unknown location," *J.L.*, 529 U.S. at 270, but rather a bystander at an active crime scene who spoke face-to-face with a police officer and whose basis of knowledge and veracity could be assessed, *see White*, 496 U.S. at 329. The bystander was on the scene during Corporal Howard's investigation minutes after the 911 call, with the opportunity to have observed the events and to have seen Mitchell, who had somehow made known he had a gun. This close physical and temporal proximity to the fight gives credibility to the bystander's account. *See Griffin*, 589 F.3d at 152; *Perkins*, 363 F.3d at 322; *Christmas*, 222 F.3d at 144.[5] Unlike with an anonymous tipster, Corporal Howard had the opportunity to observe the bystander's credibility and demeanor. Although he could not recall any details about the bystander four-and-a-half years later, at the time of the events, Corporal Howard was in the same position as the officers in *Griffin*, who had

---

[5] These facts also distinguish *United States v. Brown*, 448 F.3d 239 (3rd. Cir. 2006), on which Mitchell relies. In that case, the tipster had not seen the suspects or been at the scene of the crime but had only received general second-hand information that the suspects were black men wearing dark clothing. *Id.* at 241–242. That information did not provide the tipster with a sufficient basis of knowledge to identify the suspects later to police.

observed the informant's physical appearance and location and therefore could hold the informant accountable if the information provided proved false. *See Griffin*, 589 F.3d at 152; *see also Leverette v. Bell*, 247 F.3d 160, 168 n.5 (4th Cir. 2001) ("[T]he reliability of a tip must . . . be viewed [as of] the time the search becomes necessary.").[6]  And the bystander reported to a police officer in public and in close proximity to Mitchell, exposing himself or herself to potential retaliation and thereby increasing his or her reliability. *Griffin*, 589 F.3d at 152; *Christmas*, 222 F.3d at 144.

Importantly, unlike every case we have discussed thus far—both anonymous tips and face-to-face encounters—the bystander's tip here was not the catalyst that alerted officers to illegal activity and provoked police involvement. *See J.L.*, 529 U.S. at 270; *White*, 496 U.S. at 327; *Griffin*, 589 F.3d at 150; *Perkins*, 363 F.3d at 319; *Christmas*, 222 F.3d at 143.  It was not delivered to officers unsolicited when they otherwise had no reason to suspect criminal activity.  To the contrary, officers were dispatched to Rehab in response to a call from a known, identified person reporting a large fight involving an assault and a person with a gun.  At the active crime scene, the bystander provided police with more information about the suspect.  The bystander's description of a black man with a gun wearing red pants and a black shirt walking eastbound on Fourth Avenue away from Rehab was consistent with, but provided greater detail than, the initial report documented on the CAD sheet of a person with a gun at the fight.  The officers were aware of this separate,

---

[6] As we noted in *Griffin*, "[t]here is no constitutional requirement that police record the identifying information of an informant, particularly in such rapidly evolving circumstances as occurred here."  589 F.3d at 150 n.1.

15

prior report of a person with a gun, which enhanced the reliability of the bystander's tip consistent with that report.[7] In view of our precedent, the bystander's tip carried sufficient indicia of reliability to form part of Officer Black's reasonable suspicion.

B.

As a fallback position, Mitchell argues that, even if the bystander's tip were reliable, it did not sufficiently allege that he was involved in any criminal activity. Certainly, there may be situations in which there is nothing illegal about a man with a gun leaving a bar. *See J.L.*, 529 U.S. at 272 ("The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."). But Mitchell's argument artificially segregates the information the officers received. He insists that "[t]he fracas at Rehab produced two separate reports—a report of a fight among patrons that left one person knocked to the ground and a separate report that a black man with red pants was in possession of a firearm," and there was "no indication" that "those two reports had anything to do with each other." Opening Br. 21.

Mitchell's argument is simply contrary to the evidence, which we must view in the light most favorable to the Government. *See Seidman*, 156 F.3d at 547. The CAD sheet narrative, which reports the 911 call from Jim Smith and the information dispatch relayed

---

[7] For these reasons, among others, this case is unlike *United States v. Martinez*, 486 F.3d 855 (5th Cir. 2007), on which Mitchell relies. In that case, the officers' sole basis for stopping the defendant was an anonymous tip that he "might have been a witness to a quadruple homicide" and "might [have been] in possession of the weapons used in the homicide." *Id.* at 858. The Government produced no evidence about the source of the tip, no verified information that criminal activity may be afoot, and no corroboration of facts linking the defendant to illegal activity. *Id.* at 861–863.

16

to the officers, reported a fight with an assault victim "IN THE LOT ADV[ISED] ABOUT 30 PEOPLE INVOLVED / ADV[ISED] HEARD SOMEONE SAY THEY HAD A GUN." J.A. 139. Officers received this report of a person with a gun at the fight where the assault occurred before Corporal Howard arrived on the scene. When Corporal Howard arrived at Rehab four or five minutes later, a bystander informed him that a man with a gun was leaving the area headed eastbound on Fourth Avenue. It was entirely reasonable for the officers to infer from the dispatch, as reflected in the CAD sheet, that the person with a gun was "involved" in the fight that resulted in an assault victim. And it was entirely reasonable for the officers to infer that the information Corporal Howard communicated over the radio about a man with a gun leaving the scene of the crime related to the same person. The 911 call and the bystander's tip together provided reasonable suspicion to believe that the departing man with the gun was connected with the illegal activity and justified an investigatory stop.[8]

## IV.

Guided by our precedent, we conclude that the totality of the circumstances demonstrate that the officers here acted within the bounds of the Fourth Amendment in stopping Mitchell. We therefore affirm the district court's order denying Mitchell's motion to suppress.

---

[8] We disagree with the dissent's assertion that this case is "very similar" to *United States v. Massenburg*, 654 F.3d 480 (4th Cir. 2011). *Infra* at 23. In that case, an anonymous caller reported "shots fired" in a general area, no one identified the defendant or any suspect, and the officer based his suspicion on the defendant's refusal to consent to a voluntary frisk. *Massenburg*, 654 F.3d at 482–483. The dissent's discourse on "high crime neighborhoods" is also puzzling, given the facts of this case. *Infra* at 25–26.

17

*AFFIRMED*

WYNN, Circuit Judge, dissenting:

The facts in this appeal show that although around thirty people were involved in a bar brawl, police officers responded by stopping only one person—Mitchell—who was reportedly carrying a gun a full block away from the fight. There was no evidence that Mitchell was involved in the bar brawl. Nor was there any evidence that he was involved in the reported assault.

So, at the end of the day, this is what the majority opinion holds: police officers may lawfully stop anyone in the vicinity of reported unlawful activity whom a bystander says has a gun. But the Fourth Amendment demands a more particularized and individualized suspicion of illegal activity to conduct a warrantless stop. Because carrying a gun is presumptively lawful in West Virginia and thus is not an "illegal activity," I respectfully dissent.

I.

In the stop-and-frisk context, a police officer can make an investigatory stop without probable cause if the officer has "a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Reasonable suspicion is determined from the "totality of the circumstances" existing at the time of the stop. *United States v. Cortez*, 449 U.S. 411, 417 (1981).

But those legal conclusions must rest on facts. That's why merely saying reasonable suspicion is supported by the totality of the circumstances, as the majority does, tells us nothing about the "circumstances" or "articulable facts" that gave rise to the conclusion of "reasonable suspicion." *See United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987)

19

(reasonable suspicion must be "grounded in specific and articulable facts"). Indeed, the government offers, and the majority accepts, just two particular facts: the phone call from Jim Smith and the anonymous bystander tip at the scene of the fight. Neither supports the inference that Mitchell in particular was involved in the only reported criminal activity—the assault.

A.

First, Jim Smith telephoned and reported to the Huntington Police that about thirty people were involved in the disturbance at the Rehab bar. The call was shortly upgraded to include a report of an assault.[9] The police transcript of the call adds, "ADV[ISED] HEARD SOMEONE SAY THEY HAD A GUN." J.A. 139.

Second, Corporal Ben Howard spoke face-to-face with an unidentified informant at Rehab. This interaction prompted him to report over the police radio that "a bystander had told him that a male with red pants, black shirt, a black male had a firearm on him and was walking eastbound on 4th Avenue."[10] J.A. 45. Based on this description, other officers identified and stopped Mitchell three-and-a-half minutes later.

---

[9] Specifically, the police report reads: "ADV[ISED] ONE SUSP[ECT] KNOCKED OUT LAYING ON THE GROUND." J.A. 139.

[10] Corporal Howard does not actually remember exactly what he reported over the police radio on the night in question. Nor is there a CAD entry or other contemporaneous record of that report. Rather, this recitation comes from another officer's testimony at the suppression hearing some four-and-a-half years after the incident. As discussed further below, Corporal Howard does not remember anything else about his interaction with the bystander aside from this description of Mitchell.

20

These facts contribute nothing toward a finding of reasonable suspicion because they do not specifically link Mitchell to any criminal activity. *See United States v. Massenburg*, 654 F.3d 480, 486–88 (4th Cir. 2011).

As to the call from Smith, the only illegal activity alleged was a general report about a disturbance and assault at Rehab. Nothing in the Smith call connected the reported disturbance and assault with Mitchell—or with anyone, for that matter.

In addition, the police transcript is unclear as to what Smith knew about the gun. The transcript—"ADV[ISED] HEARD SOMEONE SAY THEY HAD A GUN"—could be read in one of two ways: (1) that Smith himself heard someone claim to have a gun or (2) that someone else told Smith that they heard a third party claim to have a gun. In neither interpretation does it appear that Smith saw a gun. J.A. 139. Smith's call reporting a large bar fight and an assault was certainly enough for the Huntington police to respond to an evolving situation. But the report lacked any specificity supporting reasonable suspicion to stop Mitchell.

On to the bystander. This "circumstance" is even more worrisome. First, this person, who provided the only information remotely identifying Mitchell and connecting him to a firearm, is wholly anonymous. Corporal Howard does not remember anything about him or her, nor does the record provide any further detail. As such, this tip has low "indicia of reliability." *Adams v. Williams*, 407 U.S. 143, 147 (1972).

The majority states that the in-person nature of the encounter ensures reliability, because Officer Howard could presumably judge the bystander's credibility and demeanor. But while an in-person, anonymous tip generally has greater indicia of reliability than one

21

delivered via phone, the specific facts surrounding the tip must still indicate reliability. Here, no such assurances existed.

Indeed, as Corporal Howard testified, the situation at Rehab was "very dynamic, lots of people yelling and screaming, running up and getting in cars." J.A. 85. A mere three-and-a-half minutes passed between Corporal Howard's arrival at Rehab and Mitchell's arrest. So Corporal Howard arrived at Rehab, spoke to a bystander in the midst of a large and chaotic disturbance, and reported the description over his police radio; and Officers Black and Felix then heard the call, spotted Mitchell, stopped him, frisked him, found the gun, and called it in—all in under four minutes. Although we must be mindful not to apply legal technicalities to split-second decisions by officers, as a matter of common sense it is fair to ask—in such a turbulent and "dynamic" situation, and in the span of a few minutes— how thorough the responding officer's assessment of the anonymous informant's credibility and demeanor could possibly have been. J.A. 85. If this fleeting, unmemorable interaction is deemed reliable, it stretches the imagination to envision one that would not be.

Additionally, in-person tips are generally seen as more reliable because of the potential for accountability. This could be because the tipster and defendant know each other, *see United States v. Heard*, 367 F.3d 1275, 1277, 1279–80 (11th Cir. 2004) (informant presumably knew the defendant because the defendant gave her money), or because the tipster gives identifying information that allows the police to follow up with him or her after the fact, *see United States v. Christmas*, 222 F.3d 141, 144 (4th Cir. 2000) (informant provided her home address to officers). Here, nothing in the record suggests

22

that the tipster knew Mitchell or that there was any way for the officers to follow up in the event of a false report. As such, there was little potential for accountability.

Furthermore, like Smith, the bystander provided no information specifically linking Mitchell to criminal activity. The bystander's description comprised only Mitchell's race, gender, and clothing; the direction he was heading; and that he had a gun. The Supreme Court has held that providing "easily obtained facts and conditions existing at the time of the tip" is insufficient to support reasonable suspicion. *Alabama v. White*, 496 U.S. 325, 332 (1990). Here, too, the bystander tip at most provided information that could "identify a determinate person." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). As such, the accuracy of the tip's description is irrelevant because the tip tells us nothing about any criminal activity specific to Mitchell.

To summarize, Smith's tip identified criminal activity: an assault arising from a bar disturbance. The bystander's description of Mitchell reported that he was near the bar and in possession of a gun. A crucial factual link is missing—whether Mitchell was involved in any illegal activity.

In *Massenburg*, we overturned the district court's denial of a motion to suppress a firearm based on very similar facts. 654 F.3d at 482. We said that the factors allegedly justifying the stop—that the officers were responding to a "vague report" of criminality and that the defendant was four blocks from the site of reported gunfire in a high-crime area—did "little to create particularized suspicion" that the defendant himself was involved

23

in unlawful activity. *Id.* at 486.[11] As we emphasized, "the Constitution requires 'a *particularized* and objective basis for suspecting *the particular person stopped* of criminal activity.'" *Id.* (quoting *Cortez*, 449 U.S. at 417–18). Such a particularized basis is likewise absent here.

B.

The majority opinion references additional factors in the totality analysis, but they carry no weight under the facts of this case.

For example, the majority relies on the fact that the stop occurred shortly after Corporal Howard arrived at Rehab, and that Mitchell was spotted near the fight in the parking lot. Proximity to the disturbance does not contribute to reasonable suspicion here. The officers responded to Rehab at closing time. They arrested Mitchell a few minutes later, a block away, walking away from the bar. Leaving a bar after it closes is the natural thing to do. Law-abiding individuals likewise often move away from large, violent conflicts. Nor did Mitchell exhibit any suspicious behavior or try to flee upon being approached by the officers—there was no "suspicious location, evasive reaction, and path of escape" that we have elsewhere found relevant in assessing reasonable suspicion. *United*

---

[11] The majority implies that *Massenburg* was about reasonable suspicion resting on a police officer's conclusion that the defendant appeared nervous when refusing to consent to a frisk. *See* Majority Op. at 17 n.8. But in *Massenburg*, we found that the defendant's allegedly-nervous behavior in front of the officer—lack of eye contact, standing a few feet apart from his companions, and refusing to consent to a frisk—*also* did not contribute to reasonable suspicion. *Massenburg*, 654 F.3d at 489–91. That conclusion does not change *Massenburg*'s earlier finding: that proximity to anonymous allegations of criminal activity in a high-crime area contributes little to a finding of reasonable suspicion. *See id.* at 487–88.

24

*States v. Bumpers*, 705 F.3d 168, 173 (4th Cir. 2013). Finally, the stop occurred around closing time for bars in a downtown area, when dozens of people were also leaving, further reducing any *individualized* suspicion that Mitchell was involved in criminal activity. *Cf. Moore*, 817 F.2d at 1106 (upholding a stop when the officer responded within minutes and observed defendant 30 to 40 yards down an *otherwise deserted* road).

The majority also cites testimony that Huntington police were frequently dispatched to Rehab and other bars at closing hours to deal with fights and other disturbances. The implication seems to be that Rehab was in a "high crime" area.[12] "[T]he fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Wardlow*, 528 U.S. at 124 (quoting *Adams*, 407 U.S. at 144). How relevant, though, is open to question. We should not place too much emphasis on location in the Fourth Amendment analysis. *See Griffin*, 589 F.3d at 158 (Gregory, J., dissenting) ("Otherwise, we relegate those unfortunate enough to have to live in such 'high crime areas' to second-class citizenship for purposes of the Fourth Amendment."). This is all the

---

[12] Although the majority asserts that the "dissent's discourse on 'high crime neighborhoods' is . . . puzzling," Majority Op. at 17 n.8, the majority notes that officers were frequently dispatched to the neighborhood due to bar disturbances, *see id.* at 3–4, and classifies it as a "problem area," *id.* at 8. And the majority's supporting cases concerned areas with high levels of more severe criminal activity: *United States v. Kehoe*, 893 F.3d 232, 235 (4th Cir. 2018) (area known for bar fights *as well as gunshots*), and *Wardlow*, 528 U.S. at 124 (classifying "an area known for heavy narcotics trafficking" as a "high crime area"). Thus, notwithstanding the majority's veiled attempt to avoid characterizing Rehab as in a "high crime area," that conclusion is a self-evident implication of its reasoning, which cannot be undone by vague references to the "facts of this case." Majority Op. at 17 n.8.

more true given the commonplace observation that "high crime" neighborhoods may be closely correlated with race and income. As we have previously observed:

> In our present society, the demographics of those who reside in high crime neighborhoods often consist of racial minorities and individuals disadvantaged by their social and economic circumstances. To conclude that mere presence in a high crime area at night is sufficient justification for detention by law enforcement is to accept *carte blanche* the implicit assertion that Fourth Amendment protections are reserved only for a certain race or class of people. We denounce such an assertion.

*United States v. Black*, 707 F.3d 531, 542 (4th Cir. 2013). As such, the fact that disturbances frequently occurred at Rehab at closing time does not support the inference that someone seen walking away from the bar at closing time was involved in an ongoing disturbance.[13]

## C.

Ultimately, the only evidence we have of illegal activity is a general report of a bar fight and an assault. Nothing connects Mitchell *in particular* with the bar fight, the assault, or any other criminal activity.

The majority, seemingly recognizing that the totality analysis boils down to this factual deficiency, repeatedly concludes that the officers could "reasonably infer" that

---

[13] Further, the record in this case does not support finding Rehab to be in a "high-crime" area for purposes of a *Terry* analysis. Our cases emphasizing this factor involve whole neighborhoods known for criminal activity such as drug trafficking or gang violence. *See, e.g.*, *Griffin*, 589 F.3d at 150 (motel well-known as a location for violent crime and drug trafficking); *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004) (a known drug house already under investigation in a "high-crime, drug-ridden neighborhood"). By contrast, Rehab was in a downtown business district and was described by the government at oral argument as akin to a "college bar." Oral Argument at 28:22–27, https://www.ca4.uscourts.gov/OAarchive/mp3/18-4654-20191031.mp3.

Mitchell was involved in the fight or assault because Smith reported that someone said a person had a gun, and because a bystander provided a description of Mitchell and said he was armed. Majority Op. at 8, 10; *see also id.* at 17. Indeed, the majority goes further, concluding that Mitchell must have "somehow made known he had a gun" at the scene of the disturbance. Majority Op. at 14.

This is mere speculation. The record contains no *facts* describing why the bystander reported the gun specifically, or Mitchell's appearance more generally. At bottom, then, the majority's analysis rests on the unsupported proposition that it was reasonable for the police to infer that Mitchell was involved in the assault simply because a bystander described him and stated that he was leaving the vicinity.

But "in justifying the particular intrusion the police officer must be able to point to *specific and articulable facts* which, taken together with *rational inferences* from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968) (emphases added). Lest there be any doubt on this score, *Terry* continued: "This demand for *specificity in the information* upon which police action is predicated is *the central teaching* of this Court's Fourth Amendment jurisprudence." *Id.* at 21 n.18 (emphases added).

The majority cannot point to "specific and articulable facts" that Mitchell was involved in the altercation, or in any criminal activity. As a result, the majority flips the *Terry* analysis: it first looks to, and puts undue weight on, the "inferences," shorn of the requisite particularized facts.

Indeed, the majority's approach would find it reasonable to conclude that criminal activity was afoot with respect to an individual—and thus that there is reasonable suspicion

27

for a stop—any time that individual is in the vicinity of an assault and is merely described by another person at the scene. I find it difficult to discern any limiting principle in that reasoning, which would apply with equal force in a residential subdivision, at a place of worship, or in the street outside the courthouse. That is unsurprising, because the majority's approach is in no way particularized.

## II.

Another aspect of the majority opinion bears mentioning: that, even though the only reported criminal activity was a physical altercation involving dozens of individuals, the officers' focus was apparently solely on one individual who was reported to have a firearm—something that is presumptively lawful in West Virginia. The majority opinion adds to a trend in this Court's jurisprudence creating special constitutional burdens on those who choose to carry firearms, lawfully or not.

Though they received a report implicating thirty people in a disturbance, the officers stopped only Mitchell. Had the officers showed up at Rehab and received a tip stating, "a man with a red pants, a black shirt, a black male is walking eastbound on 4th Avenue," they would have had no reasonable suspicion of criminal activity by that person. If the tip further stated that the man was involved in the assault, then the officers might have had a basis for a stop.

But that is not what was said. The tip simply stated that Mitchell had a gun. This is the only factor that distinguished him from the many other individuals in the vicinity of Rehab and at the fight. No one else was stopped, even though people were still present at

a large and ongoing disturbance, and even though the assault victim was presumably still at the scene.

Thus, this is ultimately a case about a man who was stopped because an anonymous tipster reported that he had a gun. But that allegation provides no basis for inferring that Mitchell was involved in any illegal activity.

First, West Virginia law permits concealed carry with a permit. *See* W. Va. Code § 61-7-4 (2012). And there was no reason for the officers to believe Mitchell lacked a permit before they stopped him—they simply had a report of a black man wearing red pants and a black shirt who had a gun. *See United States v. Gooding*, 695 F.2d 78, 82 (4th Cir. 1982) (reasonable suspicion is determined by objective standards as they existed "at the time of the seizure").

Second, the Supreme Court has specifically declined to adopt a "firearm exception" to the *Terry* analysis. *See J.L.*, 529 U.S. at 273 ("[T]he Fourth Amendment is not so easily satisfied" by permitting police officers to "conduct *Terry* frisks on the basis of bare-boned tips about guns."). And this Court has held that openly carrying a gun does not constitute reasonable suspicion to perform a stop in jurisdictions where open carry is lawful. *See Black*, 707 F.3d at 540 ("[W]here a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention. Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states."). That analysis applies with equal force to jurisdictions where concealed carry is lawful.

29

We dealt with a similar issue just three years ago, in the context of searches pursuant to a stop. *See United States v. Robinson*, 846 F.3d 694 (4th Cir. 2017) (en banc). In *Robinson*, Judge Niemeyer, writing for the majority, noted that the police received an anonymous phone call stating that a black man in a Ranson, West Virginia parking lot known for drug activity had loaded a gun, concealed it in his pocket, and climbed into a car. *Id.* at 696. Two to three minutes after the call, police officers conducted a lawful (albeit pretextual) stop of the car because the driver and passenger were not wearing seatbelts, frisked the passenger (the defendant), and found a gun. *Id.* at 697.

The *Robinson* majority upheld the frisk, noting the defendant had conceded that the traffic stop was lawful and that the officers had reasonable suspicion that he had a gun. *Id.* at 696–98. The defendant argued that although the officers knew he was *armed* they had no reason to think he was also *dangerous* because concealed carry is lawful in West Virginia with a permit. *Id.* at 698. Rejecting this argument, the *Robinson* majority merged the two concepts, holding that, if during a lawful stop the officer reasonably suspects that the person is "*armed and therefore dangerous*," the officer may frisk the person. *Id.* at 700.

The *Robinson* majority justified this holding on its finding that the risk inherent in lawful stops "is heightened exponentially when the person who has been stopped—a person whose propensities are unknown—is 'armed with a weapon that could unexpectedly and fatally be used against' the officer in a matter of seconds." *Id.* at 699 (quoting *Terry*, 392 U.S. at 23).

Here, by contrast, the issue is not the legality of a frisk pursuant to a lawful stop, but whether the stop was justified in the first instance. As such, the risk justifying the search

30

in *Robinson*—that the forced police stop might lead the defendant to use the inherently dangerous weapon he carried—is not before us today. *Id.* An irreducible minimum requirement for a stop-and-frisk is individualized suspicion of illegal activity. That existed in *Robinson* due to the lawful traffic stop. It does not exist here.

In *Robinson*, I noted in a separate opinion a necessary corollary of the approach by the majority opinion in that case: that "treating individuals armed with firearms—lawfully or unlawfully—as categorically dangerous places special burdens on such individuals." *Id.* at 706 (Wynn, J., concurring). The burden in *Robinson*: "individuals who carry firearms elect to subject themselves to being frisked when lawfully stopped by law enforcement officers." *Id.*

Today the majority in this case adds another burden to that list: individuals who carry firearms can now be lawfully *stopped* in the first instance by law enforcement officers whenever there is a generalized report of criminal activity, even if the criminal activity was a physical altercation rather than, say, a shooting, and even if there is nothing connecting that particular individual with the unlawful activity.

In *Robinson* the majority opinion in that case took the first step down this path. By making "armed and dangerous" a unitary concept, this Court made it easier for law enforcement to frisk a wide swath of individuals engaged in otherwise legal activity. The Court found good reason for that approach, given the categorical danger of firearms and the risks inherent to a forced police stop. But at least under *Robinson*, law enforcement still had to make a lawful stop based on particularized, articulable facts supporting a reasonable

31

suspicion that the defendant was involved in criminal activity. The majority opinion in this case ignores even that low bar.

## III.

As a final word: *Terry* was meant to be a limited exception, based on the practical realities that police officers face, to the default requirement of a warrant supported by probable cause. *See Terry*, 392 U.S. at 30–31. The courts have collectively moved the requirements for reasonable suspicion away from those limited circumstances. Whereas *Terry* was grounded in direct observations by a police officer suggesting ongoing or imminent criminal activity on the part of a specific individual, today it is increasingly likely that anonymous reports of varying reliability will be used to justify stops of large numbers of individuals. *Compare Terry*, 392 U.S. at 21 n.18 (emphasizing the "demand for specificity in the information upon which police action is predicated"), *with Perkins*, 363 F.3d at 325 (emphasizing the "flexible nature" of reasonable suspicion). Such flexibility has brought "the Fourth Amendment two steps closer to a death by a thousand cuts." *Griffin*, 589 F.3d at 154 (Gregory, J., dissenting).

Here, police responded to reports of a bar disturbance. They were told someone had a gun, which is presumptively lawful in West Virginia. The tip providing the information leading to Mitchell's arrest came from an anonymous informant with low potential for reliability or accountability. No evidence specifically linked Mitchell with any past, ongoing, or future criminal behavior when he was stopped. He was simply a man with a gun near a disturbance. That is not a crime in West Virginia, and it is not enough to justify

taking away his Fourth Amendment right to be free from a warrantless search. Accordingly, I dissent.