Affirmed by published opinion. Judge NIEMEYER wrote the majority opinion, in which Judge WILKINSON, Judge TRAXLER, Judge KING, Judge SHEDD, Judge DUNCAN, Judge AGEE, Judge KEENAN, Judge DIAZ, Judge FLOYD, and Judge THACKER joined. Judge WYNN wrote a separate opinion concurring in the judgment. Judge HARRIS wrote a dissenting opinion, in which Chief Judge GREGORY, Judge MOTZ, and Senior Judge DAVTS joined.
ON REHEARING EN BANC
NIEMEYER, Circuit Judge:
This appeal presents the question of whether a law enforcement officer is justified, in frisking a person whom the officer has lawfully stopped and whom the officer reasonably believes to be armed, regardless of whether the person may legally be entitled to carry the firearm. Stated otherwise, the question is whether the risk of danger to a law enforcement officer created by the forced stop of a person who is armed is eliminated by the fact that state law authorizes persons to obtain a permit to carry a concealed firearm.
After receiving a tip that a man in a parking lot well known for drug-trafficking activity had just loaded a firearm and then concealed it in his pocket before getting into a car as a passenger, Ranson, West Virginia police stopped the ear after observing that its occupants were not wearing seatbelts. Reasonably believing that the car’s passenger, • Shaquille Robinson, was armed, the police frisked him and uncovered the firearm, leading to his arrest for the possession of a firearm by a felon. .
During his prosecution, Robinson filed a motion to suppress the evidence recovered as a result of the frisk, contending that the frisk violated . his Fourth Amendment rights. The' officers, he argued, had no articulable facts demonstrating that he was dangerous since, as far as the officers knew, the State could have issued him a permit to earry a concealed firearm. After the district court denied the motion to suppress, Robinson pleaded guilty to the illegal possession of a firearm, reserving *696 the right to appeal the denial of his motion to suppress.
On appeal, Robinson contends again that the information that police received from the tip described seemingly innocent conduct and that his conduct at the time of the traffic stop also provided no basis for officers to reach the conclusion that he was dangerous. He argues, “Under the logic of the district court, in any state where carrying a firearm is a perfectly legal activity, every citizen could be dangerous, and subject to a Terry frisk and pat down.”
We reject Robinson’s argument and affirm, concluding that an officer who makes a lawful traffic stop and who has a reasonable suspicion that one of the automobile’s occupants is armed may frisk that individual for the officer’s protection and the safety of everyone on the scene. See Pennsylvania v. Mimms, 434 U.S. 106, 112, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam). The Fourth Amendment does not “require ... police officers [to] take unnecessary risks in the performance of their duties.” Terry v. Ohio, 392 U.S. 1, 23, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). And it is inconsequential that the person thought to be armed was a passenger. See Maryland v. Wilson, 519 U.S. 408, 414, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). It is also inconsequential that the passenger may have had a permit to carry the concealed firearm. The danger justifying a protective frisk arises from the combination of a forced police encounter and the presence of a weapon, not from any illegality of the weapon’s possession. See Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Michigan v. Long, 463 U.S. 1032, 1052 n.16, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).
I
The material facts in this case are not disputed. At about 3:55 p.m. on March 24, 2014, an unidentified man called the Ran-son, West Virginia Police Department and told Officer Crystal Tharp that he had just “witnessed a black male in a bluish greenish Toyota Camry load a firearm [and] conceal it in his pocket” while in the parking lot of the 7-Eleven on North Mildred Street. The caller advised Officer Tharp that the Camry was being driven by a white woman and had “just left” the parking lot, traveling south on North Mildred Street.
The 7-Eleven on North Mildred Street is adjacent to the Apple Tree Garden Apartments, and the area constitutes the highest crime area in Ranson. One officer who testified said that in his short one and a half years as a state trooper, he had experience with at least 20 incidents of drug trafficking in the 7-Eleven parking lot. Another officer testified that “when [she] was doing drug work[,] ... [she] dropped an informant off to buy drugs” at the 7-Eleven parking lot and observed “three other people waiting for drugs in that parking lot.” She added that she had personally received “numerous complaints” of people running between the parking lot and the apartment complex, making drug transactions. Another officer testified that “[a]nytime you hear Apple Tree or 7-Elev-en, your radar goes up a notch.” Accordingly, when the Ranson Police Department received the tip about someone loading a gun in the 7-Eleven parking lot, its officers’ “radar [went] up a notch,” and the officers went “on heightened alert.”
While still on the telephone with the caller, Officer Tharp relayed the information to Officer Kendall Hudson and Captain Robbie Roberts. Hudson immediately left the station to respond to the call, and Roberts left soon thereafter to provide backup.
*697 When Officer Hudson turned onto North Mildred Street a short time later, he observed a blue-green Toyota Camry being driven by a white woman with a black male passenger. Noticing that they were not wearing seatbelts, Hudson effected a traffic stop approximately seven blocks, or three-quarters of a mile, south of the 7-Eleven. He estimated that the traffic stop took place two to three minutes after the call had been received at the station.
After calling in the stop, Officer Hudson approached the driver’s side of the vehicle with his weapon drawn but carried below his waist and asked the driver for her license, registration, and proof of insurance. He also asked the male passenger, the defendant Robinson, for his identification but quickly realized that doing so was “probably not a good idea” because “[t]his guy might have a gun[,] [and] I’m asking him to get into his pocket to get his I.D.” Instead, Officer Hudson asked Robinson to step out of the vehicle.
At this point, Captain Roberts arrived and opened the front passenger door. As Robinson was exiting the vehicle, Captain Roberts asked him if he had any weapons on him. Instead of responding verbally, Robinson “gave [Roberts] a weird look” or, more specifically, an “‘oh, crap’ look[].” Roberts took the look to mean, “I don’t want to lie to you, but I’m not going to tell you anything [either].” At this point, Captain Roberts directed Robinson to put his hands on top of the car and performed a frisk for weapons, recovering a loaded gun from the front pocket of Robinson’s pants. After conducting the frisk, Roberts recognized Robinson, recalled that he had previously been convicted of a felony, and arrested him.
After Robinson was charged with the illegal possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), he filed a motion to suppress the evidence of the firearm and ammunition seized during the frisk, arguing that the frisk violated his Fourth Amendment rights.
The district court denied the motion, concluding that the officers possessed reasonable suspicion to believe that Robinson was armed and dangerous. Relying on Navarette v. California, — U.S. —, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014), the court concluded that the anonymous caller’s eyewitness knowledge and the contemporaneous nature of the report indicated that the tip was sufficiently reliable to contribute to the officers’ reasonable suspicion. The court explained that the “anonymous tip that [Robinson] [had] recently loaded a firearm and concealed it on his person in a public parking lot in a high-crime area,” as well as Robinson’s “weird look and failure to verbally respond to the inquiry whether he was armed,” gave rise to a reasonable suspicion that Robinson was armed and dangerous.
Robinson thereafter pleaded guilty to the firearm possession charge, reserving his right to appeal the district court’s denial of his suppression motion, and the district court sentenced him to 37 months’ imprisonment. Robinson appealed the denial of his motion to suppress, and a panel of this court reversed the district court’s decision denying Robinson’s motion to suppress and vacated his conviction and sentence. United States v. Robinson, 814 F.3d 201, 213 (4th Cir. 2016). By order dated April 25, 2016, we granted the government’s petition for rehearing en banc, which vacated the panel’s judgment and opinion. See 4th Cir. Local R. 35(c).
II
Robinson’s appeal is defined as much by what he concedes as by what he challenges. Robinson rightfully acknowledges that the Ranson police had the right to *698 stop the vehicle in which he was a passenger after observing a traffic violation, see Whren v. United States, 517 U.S. 806, 819, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), and also that they had the authority to direct him to exit the vehicle during the valid traffic stop, see Wilson, 519 U.S. at 415, 117 S.Ct. 882. He also correctly concedes that the anonymous tip received by the Ranson Police Department was sufficiently reliable to justify the officers’ reliance on it. See Navarette, 134 S.Ct. at 1688-89 (concluding that an anonymous 911 call “bore adequate indicia of reliability for the officer to credit the caller’s account” in large part because, like here, the caller “claimed eyewitness knowledge of the alleged [conduct]” and the call was a “contemporaneous report” that was “made under the stress of excitement caused by a startling event”). Finally, and most importantly, Robinson does not contest the district court’s conclusion that the police had reasonable suspicion to believe that he was armed.
Robinson’s argument focuses on whether the officers could reasonably have suspected that he was dangerous. He argues that while the officers may well have had good reason to suspect that he was carrying a loaded concealed firearm, they lacked objective facts indicating that he was also dangerous, so as to justify a frisk for weapons, since an officer must reasonably suspect that the person being frisked is both armed and dangerous. See Terry, 392 U.S. at 27, 88 S.Ct. 1868. Robinson notes that at the time of the frisk, West Virginia residents could lawfully carry a concealed firearm if they had received a license from the State. See W. Va. Code § 61-7-3 to -4 (2014). And, because the police did not know whether or not he possessed such a license, the tip that a suspect matching his description was carrying a loaded firearm concealed in his pocket was, he argues, a report of innocent behavior that was not sufficient to indicate that he posed a danger to others. Moreover, he argues, his behavior during the stop did not create suspicion—“he was compliant, cooperative, [and] not displaying signs of nervousness.” In these circumstances, he concludes, the officer’s frisk was not justified by any reasonable suspicion that he was dangerous.
Robinson’s argument presumes that the legal possession of a firearm cannot pose a danger to police officers during a forced stop, and it collapses the requirements for making a stop with the requirements for conducting a frisk. It thus fails at several levels when considered under the Supreme Court’s “stop-and-frisk” jurisprudence. First, Robinson confuses the standard for making stops—which requires a reasonable suspicion that a crime or other infraction has been or is being committed—with the standard for conducting a frisk—which requires both a lawful investigatory stop and a reasonable suspicion that the person stopped is armed and dangerous. See Arizona v. Johnson, 555 U.S. 323, 326-27, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009). Second, he fails to recognize that traffic stops alone are inherently dangerous for police officers. Third, he also fails to recognize that traffic stops of persons who are armed, whether legally or illegally, pose yet a greater safety risk to police officers. And fourth, he argues illogically that when a person forcefully stopped may be legally permitted to possess a firearm, any risk of danger to police officers posed by the firearm is eliminated.
We begin by noting that the Supreme Court has repeatedly recognized that whenever police officers use their authority to effect a stop, they subject themselves to a risk of harm. This holds true whether the temporary detention is a traditional, *699 “on-the-street” Terry stop to investigate an officer’s reasonable suspicion “that the person apprehended is committing or has committed a criminal offense,” Johnson, 555 U.S. at 326, 129 S.Ct. 781, or a stop of a motor vehicle and all of its occupants to enforce a jurisdiction’s traffic laws, id. at 327,129 S.Ct. 781. The. Supreme Court has explained that “the risk of a violent encounter in a traffic-stop setting ‘stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop.’” Id. at 331, 129 S.Ct. 781 (quoting Wilson, 519 U.S. at 414, 117 S.Ct. 882); see also Mimms, 434 U.S. at 110, 98 S.Ct. 330 (rejecting “the argument that traffic violations necessarily involve less danger to officers than other types of confrontations”). Indeed, the Court has concluded that traffic stops are “especially fraught with danger to police officers.” Long, 463 U.S. at 1047, 103 S.Ct. 3469. And the Court has also observed that when the stop involves one or more passengers, that fact “increases the possible sources of harm to the officer,” Wilson, 519 U.S. at 413, 117 S.Ct. 882, as “the motivation of a passenger to employ violence ... is every bit as great as that of the driver,” id. at 414,117 S.Ct. 882.
In Wilson, the Court observed that “[i]n 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops,” 519 U.S. at 413, 117 S.Ct. 882, prompting the Court to conclude that the public interest in police officer safety during traffic stops is “both legitimate and weighty,” id. at 412, 117 S.Ct. 882 (quoting Mimms, 434 U.S. at 110, 98 S.Ct. 330). And more recent statistics, unfortunately, remain as grim. Of the 51 law enforcement officers feloniously killed in the line of duty in 2014, 9 officers (or 18%) were fatally injured during traffic pursuits or stops. FBI, Officers Feloniously Killed, in Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted, 2014.
To be clear, the general risk that is inherent during a traffic stop does not, without more, justify a frisk of the automobile’s occupants. But the risk inherent in all .traffic stops is heightened exponentially when.the person who has been stopped—a person whose propensities are unknown— is “armed with - a weapon that could unexpectedly and fatally be used against” the officer in a matter of seconds. Terry, 392 U.S. at 23, 88 S.Ct. 1868. As such, when the officer reasonably suspects that the person he has stopped is armed, the officer is “warranted in the belief that his safety ... [is] in danger,” id. at 27, 88 S.Ct. 1868, thus justifying a Terry frisk.
In Terry, Officer McFadden “seized” Terry on the street and subjected him to a “search” without probable cause to believe that he had committed or was committing a crime or that he was armed, 392 U.S. at 19, 88 S.Ct. 1868. The Court was thus confronted with two distinct constitutional issues: first, whether a person could be stopped (seized) on suspicion of criminal conduct that fell short of probable cause; and second, whether the officer could conduct a protective frisk or “pat down” for weapons (search) during the stop. The Court .readily concluded that Terry’s seizure was “reasonable” under the Fourth Amendment because the officer reasonably believed that criminal conduct was afoot. Id. at 22-23, 88 S.Ct. 1868. The Court then turned its attention to the legality of the frisk, stating, “We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could-unexpectedly and fatally be used against him.” *700 Id. at 23, 88 S.Ct. 1868. The concern—i.e., the danger—was thus found in the presence of a weapon during a forced police encounter. Indeed, the Court said as much, noting in approving Officer McFadden’s frisk of Terry that “a reasonably prudent man would have been warranted in believing petitioner was armed and thus presented a threat to the officer’s safety.” Id. at 28, 88 S.Ct. 1868 (emphasis added). In this manner, the Court adopted the now well-known standard that an officer can frisk a validly stopped person if the officer reasonably believes that the person is “armed and dangerous.” Id. at 27, 88 S.Ct. 1868; see also id. at 32, 88 S.Ct. 1868 (Harlan, J., concurring) (explaining that because a “frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop”).
The Supreme Court applied Terry to circumstances analogous to those before us in Mimms, where an officer, after making a routine traffic stop, “noticed a large bulge” under the defendant’s jacket and therefore conducted a frisk. 434 U.S. at 107, 98 S.Ct. 330. Holding that the frisk was clearly justified, the Mimms Court explained that “[t]he bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer,” adding that “[i]n these circumstances, any man of ‘reasonable caution’ would likely have conducted the ‘pat down.’ ” Id. at 112, 98 S.Ct. 330 (emphasis added). The only evidence of Mimms’ dangerousness was the bulge indicating that he was armed. See id. It was thus Mimms’ status of being armed during a forced police encounter (the traffic stop) that posed the danger justifying the frisk, and we have previously relied on Mimms for that precise principle. See United States v. Baker, 78 F.3d 135, 137 (4th Cir. 1996) (citing Mimms, 434 U.S. at 112, 98 S.Ct. 330) (“Based on the inordinate risk of danger to law enforcement officers during traffic stops, observing a bulge that could be made by a weapon in a suspect’s clothing reasonably warrants a belief that the suspect is potentially dangerous, even if the suspect was stopped only for a minor violation”).
In short, established Supreme Court law imposes two requirements for conducting a frisk, but no more than two: first, that the officer have conducted a lawful stop, which includes both a traditional Terry stop as well as a traffic stop; and second, that during the valid but forced encounter, the officer reasonably suspect that the person is armed and therefore dangerous. In both Terry. and Mimms, the Court deliberately linked “armed” and “dangerous,” recognizing that the frisks in those cases were lawful because the stops were valid and the officer reasonably believed that the person stopped “was armed and thus” dangerous. Terry, 392 U.S. at 28, 88 S.Ct. 1868 (emphasis added); Mimms, 434 U.S. at 112, 98 S.Ct. 330 (emphasis added). The use of “and thus” recognizes that the risk of danger is created simply because the person, who was forcibly stopped, is armed.
In this case, both requirements—a lawful stop and a reasonable suspicion that Robinson was armed—were satisfied, thus justifying Captain Roberts’ frisk under the Fourth Amendment as a matter of law.
Robinson argues that Mimms is distinguishable because the frisk there took place in a jurisdiction that made it a crime to carry a concealed deadly weapon. West Virginia, on the other hand, generally permits its citizens to carry firearms. From this distinction, Robinson argues that when the person forcibly stopped may be legally permitted to possess a firearm, the *701 risk of danger posed by the firearm is eliminated. This argument, however, fails under the Supreme Court’s express recognition that the legality of the frisk does not depend on the illegality of the firearm’s possession. Indeed, the Court has twice explained that “[t]he purpose of this limited search [ie., the frisk] is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law” Williams, 407 U.S. at 146, 92 S.Ct. 1921 (emphasis added); see also Long, 463 U.S. at 1052 n.16, 103 S.Ct. 3469 (“[W]e have expressly rejected the view that the validity of a Temj search [ie., a frisk] depends on whether the weapon is possessed in accordance with state law”). Robinson’s position directly conflicts with these observations.
Notwithstandipg the Supreme Court’s statements, Robinson’s position also fails as a matter of logic to recognize that the risk inherent in a forced stop of a person who is armed exists even when the firearm is legally possessed. The presumptive lawfulness of an individual’s gun possession in a particular State does next to nothing to negate the reasonable concern an officer has for his own safety when forcing an encounter with an individual who is armed with a gun and whose propensities are unknown. See United States v. Rodriguez, 739 F.3d 481, 491 (10th Cir. 2013) (concluding that “an officer making a lawful investigatory stop [must have] the ability to protect himself from an armed suspect whose propensities are unknown” and therefore rejecting the defendant’s argument that the officer “had no reason to believe he was dangerous” even though the officer had seen a handgun tucked into the waistband of his pants).
Accordingly, we conclude that given Robinson’s concession that he was lawfully stopped and that the police officers had reasonable suspicion to believe that he was armed, the officers were, as a matter of law, justified in frisking him and, in doing so, did not violate Robinson’s Fourth Amendment rights.
Ill
While the lawful traffic stop of Robinson and the reasonable suspicion that he was armed justified the frisk in this case, the officers had knowledge of additional facts that increased the level of their suspicion that Robinson was dangerous.
First, the reliable tip in this case was not just that an individual matching Robinson’s description possessed a firearm. Rather, the caller reported that he had observed an individual “load a firearm [and] conceal it in his pocket” while in the parking lot of the 7-Eleven on North Mildred Street, a location that the officers knew to be a popular spot for drug-trafficking activity. Four officers testified about the high level of drug-trafficking and other criminal activity in that particular parking lot, prompting one to explain, “[a]nytime you hear ... 7-Eleven, your radar goes up a notch.” Knowing that the 7-Eleven parking lot was frequently used as a site for drug trafficking, a reasonable officer could legitimately suspect that an individual who was seen both loading and concealing a firearm in that very parking lot may well have been doing so in connection with drug-trafficking activity, making his possession of a firearm even more dangerous. See United States v. Lomax, 293 F.3d 701, 705 (4th Cir. 2002) (recognizing the “numerous ways in which a firearm might further or advance drug trafficking”).
Second, when Captain Roberts asked Robinson, as he was getting out of the car, *702 whether he was carrying any firearms, Robinson failed to respond verbally and instead gave the officer an ‘“oh, crap’ look[],” which Roberts took to mean, “I don’t want to lie to you, but I’m not going to tell you anything [either].” Surely, Robinson’s evasive response further heightened Captain Roberts’ legitimate concern as to the dangerousness of the situation.
While not necessary to the conclusion in this case, these facts can only confirm Captain Roberts’ reasonable suspicion that Robinson was dangerous and therefore should be frisked for the protection of the officer and all others present. Indeed, in light of all of the circumstances known to Captain Roberts, he would unquestionably have been criticized for not conducting a frisk if, after having failed to do so, something untoward had happened.
[[Image here]]
The judgment of the district court is accordingly

AFFIRMED.