**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-4257

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

EMMANUEL LEE BLOUNT,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Max O. Cogburn, District Judge.  (3:19-cr-00218-MOC-DSC-1)

Argued:  December 8, 2022                    Decided:  January 4, 2023

Before NIEMEYER, AGEE, and QUATTLEBAUM, Circuit Judges.

Affirmed by unpublished opinion.  Judge Niemeyer wrote the opinion, in which Judge Agee and Judge Quattlebaum joined.

**ARGUED:**  Ann Loraine Hester, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:**  Anthony Martinez, Federal Public Defender, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  Dena J. King, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

NIEMEYER, Circuit Judge:

During the course of a *Terry*[*] stop of Emmanuel Blount in the parking lot of a Target store in Charlotte, North Carolina, Charlotte-Mecklenburg Police Officer Jonathan Szynarowski recovered a firearm, leading to Blount's indictment for possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Blount filed a motion to suppress on the ground that Officer Szynarowski did not have a reasonable suspicion that criminal conduct was afoot and that, in any event, he was not entitled to search the vehicle in which Blount had been sitting immediately prior to the stop. Following an evidentiary hearing, the district court denied Blount's motion, and Blount thereafter pleaded guilty, reserving his right to appeal the denial of his motion to suppress. The court sentenced Blount as an armed career criminal under 18 U.S.C. § 924(e) to 180 months' imprisonment.

On appeal, Blount challenges only the district court's denial of his motion to suppress. We affirm.

I

On the afternoon of December 24, 2018, as Officer Szynarowski was sitting in a marked patrol car in front of the Target store, a Target employee knocked on the window of his patrol car to report that "there was a loud disturbance [and] possible fight going on in the parking lot" and that the officer "needed to check it out." When Szynarowski exited

---

[*] *Terry v. Ohio*, 392 U.S. 1 (1968) (holding that law enforcement officers may, consistent with the Fourth Amendment, conduct a brief investigatory stop when they have a reasonable suspicion that the person seized is committing a crime or is about to commit a crime to allay their suspicion).

2

his vehicle in response to this report, he "heard a [woman] screaming very loudly in the middle of the parking lot." He could not make out any words, but he later described it as "a very distressed scream" that was "very, very loud" and "sounded like [the woman] was in trouble" — "[t]he scream sounded urgent, like she needed help." Szynarowski immediately began running toward the sound and requested backup as he did so.

Officer Szynarowski discovered that the sound was coming from a car parked in the middle of the parking lot, in which Keywona McVay, a woman, was sitting in the driver's seat and Blount was sitting in the front passenger seat, holding a two-year-old child in his lap. As Szynarowski approached the car, he heard arguing, and as he walked to the passenger side, both McVay and Blount opened their car doors and quickly stated, "We're good." McVay added, "We just had an argument." Blount then stated that their son, who was crying, had "jumped out of the back of his chair" and they thought he had "bumped his head" and had "rushed to get him," but "that's all." As Blount was speaking, McVay told the officer several times, "We're good, we're good." When the two stopped speaking, Officer Szynarowski asked, "What are y'all arguing about?" Blount and McVay then denied that they had been arguing, and McVay stated, "He was crying and stuff." Blount stated that after their child had fallen and hit his head, he had been trying to tell McVay to hand him the child. Blount then handed McVay a wad of cash and told her to "go on into Target and get his stuff."

Officer Szynarowski then said to Blount, "Sir, hop out of the car," and added, after a short pause, that he needed to talk to Blount and that Blount should leave the child in the car. Blount turned his body to face the officer as if he were about to exit the vehicle but

3

then paused and did not immediately get out of the car. Instead, while still sitting, he "kept his left hand behind his back, such that [Szynarowski's] view was obstructed." But it appeared to Szynarowski that Blount was "handing items over to Ms. McVay," including "a black grocery-like . . . plastic bag," while saying to McVay, "Come on, come on, come on." Szynarowski also "observed [Blount] appear to tuck something underneath the passenger seat," but he "couldn't tell what [the] object . . . was." Szynarowski later testified that at that point in the encounter, he "personally became very uneasy" and felt "[n]ervous."

After approximately 10 seconds had passed from when Officer Szynarowski had told Blount to "hop out of the car," Blount finally exited the car but continued to hold the child. Szynarowski again told Blount to put the child in the car, but Blount instead set the child down next to him in the parking lot. When McVay asked Szynarowski if they could "just go," Szynarowski responded, "No, no, hang tight." Blount then stood so that he was facing the vehicle and raised his hands above his head, but when Szynarowski told him to place his hands behind his back, Blount said that he "didn't have anything." With his voice now raised, Szynarowski repeated the command, stating that he was not going to argue with Blount. Blount complied and was handcuffed.

While Officer Szynarowski was detaining Blount, he observed that McVay "continued to be very active inside the vehicle" and was "moving items around" while holding "a large amount of cash." Szynarowski told McVay to "put the money down" and also several times to "stop" before yelling that she should "keep her hands on the steering wheel," a command that he had to repeat a few seconds later. After Szynarowski asked Blount if he had any weapons on him and Blount responded, "No, sir," Szynarowski

4

directed Blount to stand near the front of the vehicle, where he patted him down. Szynarowski then approached the driver's side of vehicle, asked McVay to step out of the car, and handcuffed her as well.

Once both Blount and McVay were in handcuffs, Officer Szynarowski had them stand by the front hood of the car, where he asked them for their names and dates of birth, which they both provided. McVay then repeated that the commotion was because their son had fallen, but Szynarowski indicated that "[w]hat [he] heard was not consistent with that" and that "people [had been] coming up to [him] saying y'all are arguing and yelling."

When back-up units were nearby, Officer Szynarowski went to the passenger side of the vehicle and, as he later testified, "began to frisk the vehicle for any weapons." First, he picked up and looked through the black plastic bag that he thought Blount had handed to McVay, finding that it only had paper or trash in it. Next, he looked into the green diaper bag that McVay had pulled to the front seat right after Szynarowski had asked Blount to get out of the car, also finding nothing of interest. Finally, he searched the console area and found a black handgun "tucked just under the passenger seat." The back-up police officers then placed Blount in the back seat of their patrol car, as Szynarowski had "determined at that point that [Blount] was under arrest for, at minimum, carrying a concealed weapon." Szynarowski then searched the rest of the vehicle and recovered what appeared to be a small amount of crack cocaine that had been wrapped inside a dollar bill and stuffed in the area around the passenger-door handle.

At the police station later that day, Blount waived his *Miranda* rights and admitted to possessing the firearm that Officer Szynarowski had found in the vehicle.

5

After a federal grand jury indicted Blount for knowingly possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1), Blount filed a motion to suppress evidence of the firearm recovered from the car, as well as his post-arrest statement, challenging, under the Fourth Amendment, both his *Terry*-stop seizure and Officer Szynarowski's subsequent search of the vehicle. With respect to the *Terry* stop, he argued that "Officer Szynarowski [had] seized [him] absent reasonable suspicion of criminal activity" because all Szynarowski could point to was "a third-party report of a verbal argument between a man and a woman" and "his observation that Mr. Blount [had] placed something under his seat," neither of which, according to Blount, gave "rise to a reasonable suspicion that [he] was engaged in . . . criminal activity." And with respect to Szynarowski's search of the vehicle, Blount argued that the search was unconstitutional because while Szynarowski "may have seen [him] place something under his seat," that observation was "insufficient to justify a reasonable suspicion that [he] was . . . armed and dangerous."

The district court conducted a full evidentiary hearing on Blount's motion to suppress. Officer Szynarowski was the only witness to testify, but the government also introduced into evidence the recording from the body camera that Szynarowski had been wearing that day. After receiving this evidence and the parties' arguments, the court announced that it was going to deny Blount's motion. In a subsequent written order, the court held first that Szynarowski's investigatory stop of Blount was lawful because it was supported by reasonable suspicion. The court noted that "[n]either [Blount] nor the Government suggest[ed] that [Blount] was seized at the point he was asked to 'hop out of

6

the car'" and that both parties had instead focused on "the moment that he and McVay were told 'they were not free to leave when they asked to do so,'" which happened immediately after Blount exited the vehicle.  And at that point, the court concluded, Officer Szynarowski had both a "reasonable suspicion to investigate possible domestic [violence] crimes" and a reasonable suspicion "that a 'weapons crime' might have been occurring." Based on the evidence presented, the court found that "(1) a Target employee [had] informed the officer of a 'loud disturbance [and] possible fight' in the parking lot; (2) the officer heard a 'very, very loud scream' from a female 'that sounded like she was in trouble'; (3) the officer discovered a 'male and a female' in the car with a crying child; (4) McVay admitted, but later denied, that she and [Blount] were arguing; (5) the contrary explanations for the screaming were not commensurate with the scream that was heard; and (6) the officer's experience with 'numerous' incidents suggested that domestic violence might be afoot" and that "victims of domestic violence may be initially unwilling to report abuse because of 'danger' and 'coercion' from the abuser."  The court also found that several facts existed to support the officer's suspicion "that a 'weapons crime' might have been occurring" — namely, that "[w]hen the officer asked [Blount] to 'hop out of the car' and to leave the child, [Blount]: (1) hesitated for several seconds; (2) turned his body toward the officer to obstruct [the officer's] view; (3) appeared to hold a plastic bag; (4) appeared to tuck something underneath the passenger seat; and (5) exited the vehicle with the child in his arms."  The court stated, "When considered alongside previously discussed factors, these furtive, obstructive actions support a brief investigatory stop to

7

confirm or dispel the officer's suspicion that [Blount] possessed a weapon and that he possessed it unlawfully."

The district court also rejected Blount's argument that Officer Szynarowski's search of the vehicle was unlawful, concluding that Blount's "furtive and obstructive movements afforded a reasonable basis to believe that he was armed and dangerous," thus supporting a protective search of the vehicle under *Michigan v. Long*, 463 U.S. 1032, 1049 (1983).

At bottom, the court concluded that Officer Szynarowski's investigatory stop and protective search of the vehicle "were reasonable under the totality of the circumstances" and therefore denied Blount's motion to suppress.

Blount pleaded guilty, reserving his right to appeal the denial of his motion to suppress, and the district court sentenced him to 180 months' imprisonment. This appeal followed, challenging only the suppression ruling.

II

A

Blount contends first that when he was seized in the Fourth Amendment sense, Officer Szynarowski did not have a reasonable suspicion to do so. Blount marks the point of seizure as when Szynarowski ordered him out of the car, which differs from his position in the district court. He argues that at the time Szynarowski seized him by ordering him to exit the car, "the only information Szynarowski had was that Blount and McVay had argued loudly with each other in a crowded Target parking lot, in broad daylight" and that they "had explained that they were shouting because [their] baby fell out of his car seat and was

8

crying." Those circumstances, Blount maintains, do not support a reasonable suspicion that criminal conduct was afoot so as to justify a *Terry* stop.

This argument, however, fails in two respects. First, it places the seizure *before* Blount's delayed submission to Officer Szynarowski's order to "hop out of the car." Second, it fails to account fully for the facts found by the district court.

Fourth Amendment jurisprudence is clear that a police officer can seize a suspect in one of two ways — first, by "application of physical force to the body of a person with intent to restrain," and second, by "a 'show of authority' that 'in some way restrains the liberty' of the person." *Torres v. Madrid*, 141 S. Ct. 989, 994–95 (2021) (cleaned up) (quoting *Terry*, 392 U.S. at 19 n.16). And where the officer's means of effecting a seizure is a show of authority, a seizure does not occur until the suspect yields to the officer's show of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (explaining that a seizure "requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority"); *see also Torres*, 141 S. Ct. at 995 (explaining that "the common law of arrest," which informs the Court's interpretation of "seizure" in the Fourth Amendment, "distinguished the application of force from a show of authority, such as an order for a suspect to halt," and that "[t]he latter does not became an arrest *unless and until the arrestee complies with the demand*" (emphasis added)); *Brendlin v. California*, 551 U.S. 249, 255 (2007) ("A police officer may make a seizure by a show of authority and without the use of physical force, *but there is no seizure without actual submission*; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned" (emphasis added)).

9

Under these principles, it is apparent that Blount was *not* seized when Officer Szynarowski told him to "hop out of the car," as Blount contends on appeal. While Szynarowski's order may have constituted a "show of authority," it is undisputed that Blount did not immediately comply with that order and thus did not immediately submit to the show of authority. Instead, he remained seated in the car, with his body facing Szynarowski and, with his left hand behind his back and out of the officer's view, made furtive movements for approximately ten seconds. It was only after that delay that Blount submitted to Officer Szynarowski's order. At that point, but not before, he was seized under the Fourth Amendment.

In holding that the seizure was justified at that point in time, the district court pointed to a number of specific facts, finding (1) that a Target employee had sought out Officer Szynarowski to report a "'loud disturbance [and] possible fight' in the parking lot"; (2) that when Szynarowski got out of his patrol car, he could hear "a 'very, very loud scream' from a female 'that sounded like she was in trouble'" that was sufficiently alarming that Szynarowski immediately broke into a run and called for backup; (3) that Szynarowski "discovered a 'male and a female'" arguing in a car "with a crying child"; (4) that "McVay admitted, but later denied, that she and [Blount] were arguing"; (5) that "the contrary explanations [given by McVay and Blount] for the screaming" — *i.e.*, that their child had fallen and hit his head but was now fine — "were not commensurate with the scream that [Szynarowski] [had] heard"; (6) that in "the officer's experience," "victims of domestic violence may be initially unwilling to report abuse," especially in front of their abuser; (7) that when Szynarowski asked Blount to "hop out of the car," Blount instead "hesitated

10

for several seconds"; (8) that while hesitating, Blount "turned his body toward the officer to obstruct [the officer's] view"; (9) that it then appeared to Szynarowski that Blount was "hand[ing] items over to Ms. McVay," including a "black grocery-like . . . plastic bag"; and (10) that Szynarowski then saw Blount make a movement like he was "tuck[ing] something underneath the passenger seat" shortly before Blount finally exited the vehicle. Based on our review of the record, we find no clear error in the district court's factual findings. And taking those in their totality, we conclude that they were clearly sufficient to warrant a reasonable officer in Officer Szynarowski's position in suspecting that Blount was engaged in ongoing criminal activity, thus justifying the *Terry* stop.

B

Blount next contends that even if the seizure was justified, Officer Szynarowski "lacked reasonable suspicion that Blount was armed and dangerous," arguing that "Blount's arm movements were not enough to support reasonable suspicion that he was hiding a weapon under the seat." He thus concludes that Officer Szynarowski was not justified in conducting a brief search of the car for a weapon.

As we have recognized, when a suspect is subject to a "forced police encounter" and the suspect is reasonably believed to possess a weapon, a danger exists, justifying a protective frisk. *United States v. Robinson*, 846 F.3d 694, 696 (4th Cir. 2017) (en banc) (recognizing that "[t]he danger justifying a protective frisk arises from the combination of a forced police encounter and the presence of a weapon"). Thus, in circumstances that give

11

rise to the reasonable suspicion of the presence of a weapon, we should not require a showing so onerous as to put the officer's safety at risk.

Here, Szynarowski heard a "very, very loud," "distressed scream" indicating to him that a woman "was in trouble" and "needed help" "urgent[ly]." And when Szynarowski sought to separate McVay and Blount, Blount delayed complying with his order, making furtive movements that caused Officer Szynarowski to reasonably believe that Blount may have been tucking a gun under the front seat. Indeed, while Blount was making those movements, Officer Szynarowski, who was an experienced officer, indicated that he became "uneasy" and "nervous" for his own safety. We conclude that in these circumstances, Szynarowski had a reasonable suspicion to justify a frisk and search of the vehicle for the presence of a weapon. *See Long*, 463 U.S. at 1035, 1037 (recognizing "the authority of a police officer to protect himself by conducting a *Terry*-type search of the passenger compartment of a motor vehicle during the lawful investigatory stop of the occupant of the vehicle" where the officer has "reason to believe that the vehicle contained weapons potentially dangerous to the officer[]").

C

Finally, Blount contends that Officer Szynarowski's search of the car "exceeded the permissible scope of a vehicle 'frisk' for weapons" because he searched a grocery bag "even though the bag's appearance, movements, and light weight made it obvious that it could not contain an object as heavy as a weapon" and a diaper bag and its zippered pockets "even though those pockets were too small to hold a weapon."

12

To be sure, a *Terry*-type search of the vehicle's passenger compartment for weapons must be "limited to those areas in which a weapon may be placed or hidden." *Long*, 463 U.S. at 1049. But Blount does not appear to have argued to the district court that Officer Szynarowski exceeded the scope of a permissible search by looking inside the grocery bag or the diaper bag, including the small pockets of the diaper bag. Moreover, even were we to accept Blount's argument in this regard, it would still not justify suppressing the evidence at issue in this case. A cautious search of the area where Blount was seated would reasonably include the search of both bags that were the subject of Szynarowski's earlier observations when speaking with Blount and McVay, as well as the console area, the door compartment, and the area underneath the passenger seat. In any event, Szynarowski's search of the bags was completely unconnected to his subsequent discovery of the handgun underneath the passenger seat.

The judgment of the district court is accordingly

AFFIRMED.

13