Filed 1/17/23  P. v. Superior Court (Boget) CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>      Petitioner,<br><br>      v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>      Respondent;<br><br><br>JAMES MITCHELL BOGET,<br><br>      Real Party in Interest. | D080933<br><br>(San Diego County<br>Super. Ct. No. SCE396295) |

ORIGINAL PROCEEDING in mandate challenging an order of the Superior Court of San Diego County, John M. Thompson, Judge.  Petition granted.

Summer Stephan, District Attorney, Linh Lam, Valerie Ryan, and Ronald A. Jakob, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Katherine Braner, Chief Deputy Public Defender, Kristen Santerre Haden and Emily Rose-Weber, Deputy Public Defenders, for Real Party in Interest.

By petition for writ of mandate, the People challenge the superior court's order granting in part a motion by James Mitchell Boget to suppress evidence linking him to a murder. The People contend the court erroneously ruled the police officer who detained Boget in a traffic stop did not have reasonable suspicion to conduct a frisk for weapons that led to incriminating evidence. We agree and grant the petition.

## I.
## BACKGROUND

A. *The Murder*

William Mambro was found dead in a bedroom of his house in La Mesa on December 28, 1983. He had been stabbed, strangled, and bludgeoned. The house had been ransacked. Foreign and domestic coins, including Buffalo nickels and solid silver coins, and butts and empty packages of Marlboro cigarettes were scattered about. Mambro was last seen alive four days earlier leaving Petrucelli's Bar with Boget.

B. *The Traffic Stop, Arrest, and Custodial Questioning*

On December 26, 1983, Officer Larry D. St. Mars of the El Cajon Police Department was on patrol when he spotted a car with an expired registration. He stopped the car and asked the driver and passenger for identification. Neither had any. The driver identified himself as Kent Hughes Clark, and the passenger identified himself as Boget. St. Mars ran a records check and summoned another police officer to the scene. After the other officer arrived, Clark and Boget were asked to exit the car and did so.

2

St. Mars proceeded to question Boget, who admitted he had just been in prison for forgery and was on parole. During the questioning, St. Mars observed "a bulge" in Boget's left coat pocket and asked whether Boget had any weapons. Boget answered, " 'No.' " St. Mars then touched the bulge and felt what he believed to be the handle of a knife. Boget said, " 'I'm not supposed to have those, I was just returning them, they were a Christmas present.' " Boget then removed three knives from his pocket. St. Mars arrested Boget for possession of a concealed dirk or dagger. Upon being booked into jail, Boget was found in possession of three Buffalo nickels, a silver quarter, an Asian coin, and a pack of Marlboro cigarettes.

While Boget was in jail, Sergeant Arthur Haber of the La Mesa Police Department learned a bartender had seen Boget leave Petrucelli's Bar with Mambro on December 24, 1983. Haber went to the jail to interview Boget on January 5, 1984. Haber gave Boget the warnings required by *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).[1] Boget said he understood the warnings and agreed to talk to Haber. Boget said he did not know Mambro and had never been to his house. Boget then recounted his company and whereabouts from December 24, 1983, until his arrest two days later. Boget told Haber the knives found during the traffic stop by St. Mars were a Christmas gift from Marsha Love, and the Buffalo nickels and silver quarter found when Boget was booked into jail had been given to him as change in a purchase.

Haber contacted some of the people in whose company Boget said he had been between December 24 and 26, 1983, and then interviewed Boget a

---

[1] "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Miranda, supra*, 384 U.S. at p. 444.)

second time at the jail on January 10, 1984. Haber again gave Boget the *Miranda* warnings, which he said he understood. When Haber told Boget his statements during the prior interview were inconsistent with those of Love and others Haber had contacted, Boget said they must have been lying. Boget changed his story about the knives and said he received them from somebody at Love's apartment complex, but he could not identify the donor. Boget again said he had received the coins as change in a purchase. He also again claimed he did not know and never had any contact with Mambro.

C.     *The Criminal Charges*

The murder investigation went dormant for many years and became active again in 2019, when DNA matching Boget's profile was found on cigarette butts from the scene of Mambro's murder. In November 2019, the People filed a felony complaint against Boget alleging he murdered Mambro (Pen. Code, § 187, subd. (a)) and personally used a deadly and dangerous weapon (a knife) in the murder (*id.,* § 12022, subd. (b)). After a preliminary hearing in February 2021, Boget was held to answer. The People then filed an information containing the same charge and allegation as the complaint.

D.     *The Motion to Suppress Evidence*

Boget filed a motion to suppress all items found and statements made to law enforcement officers after St. Mars frisked him, on the ground such evidence was the product of an illegal search and seizure. (Pen. Code, § 1538.5, subd. (a)(1)(A).) Boget argued that because St. Mars did not have reasonable suspicion to detain him or to frisk him for weapons, the detention and frisk violated the federal and state constitutional prohibitions against "unreasonable searches and seizures" (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13), and all evidence that was the product of the detention and frisk must be suppressed (*Mapp v. Ohio* (1961) 367 U.S. 643, 655 ["all evidence

4

obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court"]).

The People opposed the motion. They argued Boget was lawfully detained as a passenger in a car stopped for expired registration; he was lawfully ordered to exit the car; he was lawfully frisked when St. Mars observed a bulge in Boget's coat pocket that could have been caused by a weapon; and the connection between any illegality in the course of the traffic stop and Boget's jailhouse statements to Haber was so attenuated that suppression of the statements was not required.

The superior court held a hearing on the suppression motion. St. Mars testified he had no independent recollection of the traffic stop involving Boget. St. Mars's written report of the stop was admitted into evidence as past recollection recorded. (Evid. Code, § 1237.) No other evidence was admitted. The court ruled Boget's detention was lawful as part of the traffic stop; but the frisk was not lawful, because "the sole fact that [St. Mars] saw a bulge in [Boget's] coat pocket without warrant would not lead to a suspicion [Boget] was armed and dangerous." The court also ruled "[t]here were no intervening causes or sufficient attenuation" that would allow admission of Boget's statements to Haber, which were "tainted" in that Haber had access to Boget only "because of his illegal arrest." The superior court ordered suppression of the items found on Boget's person during the frisk and his booking into jail as well as his statements to Haber.[2]

E.    *The Writ Proceeding*

The People petitioned this court for a writ directing the superior court to vacate its order granting the suppression motion and to enter a new order

---

[2]    The superior court refused to suppress record albums found in the car. That ruling is not challenged in this writ proceeding.

5

denying the motion. (Pen. Code, § 1538.5, subd. (o).) We issued an order directing the superior court to show cause why the relief sought in the petition should not be granted. Boget filed a return, and the People filed a reply.

## II.

## DISCUSSION

The People contend the superior court erroneously ruled St. Mars's observation of a bulge in Boget's coat pocket during the traffic stop did not justify the frisk for weapons that led to the evidence against him. The People also contend the court erroneously suppressed Boget's statements to Haber at the jail on the ground that but for the illegal frisk Boget would not have been arrested and available in jail for questioning. Even if the frisk was illegal, say the People, the court should have ruled the passage of time and intervening circumstances so attenuated any nexus between the frisk and Boget's statements that suppression was not required. Defending the superior court's rulings, Boget argues suppression of the incriminating physical evidence was required because St. Mars's observation of the bulge did not justify the frisk. Boget also argues his statements to Haber must be suppressed as derivative of the illegal frisk. After setting forth the applicable standard of review, we shall address the parties' competing contentions.

A. *The Standard of Review*

When the facts are undisputed, we independently determine the legality of a challenged search or seizure. (*People v. Aldridge* (1984) 35 Cal.3d 473, 477; *People v. Holiman* (2022) 76 Cal.App.5th 825, 831; *People v. Balint* (2006) 138 Cal.App.4th 200, 205.) The only facts relevant to the traffic stop and the frisk of Boget are those stated in St. Mars's written report; no other evidence concerning those matters was introduced at the

6

hearing on the suppression motion. The trial court's application of the law to those facts thus presents a purely legal question subject to our de novo review.

B.    *The Legality of the Frisk*

We apply federal constitutional law to decide whether the superior court correctly suppressed the evidence against Boget as the product of an illegal search. (*People v. Buza* (2018) 4 Cal.5th 658, 685.) When a defendant in a criminal case moves to suppress evidence, a trial court may grant the motion only if the evidence was obtained in violation of the United States Constitution. (Cal. Const., art. I, § 28, subd. (f)(2); *In re Lance W.* (1985) 37 Cal.3d 873, 879 (*Lance W.*); *People v. Roberts* (2021) 68 Cal.App.5th 64, 81-82 (*Roberts*).) The United States Supreme Court has held a police officer may, without violating the Fourth Amendment, stop a vehicle when the officer has probable cause to believe a traffic violation has occurred (*Whren v. United States* (1996) 517 U.S. 806, 810), order the driver and any passengers to exit the vehicle (*Maryland v. Wilson* (1997) 519 U.S. 408, 410), and frisk the driver and any passengers reasonably suspected of being armed and dangerous (*Arizona v. Johnson* (2009) 555 U.S. 323, 327 (*Johnson*)). Here, St. Mars stopped the vehicle in which Boget was a passenger because its registration was expired, asked him to get out of the vehicle, and frisked him for weapons. Only the legality of the third of these actions is here contested. We thus turn to whether the frisk violated the Fourth Amendment.

The Fourth Amendment permits a police officer to frisk for weapons a person lawfully detained if the circumstances and inferences that reasonably may be drawn from them support a reasonable suspicion the person may be armed and dangerous. (*Terry v. Ohio* (1968) 392 U.S. 1, 27.) Such a frisk must "be confined in scope to an intrusion reasonably designed to discover

7

guns, knives, clubs, or other hidden instruments for the assault of the police officer," such as a pat down of the person's outer garments. (*Id.* at pp. 29-30; see *Johnson, supra*, 555 U.S. at p. 326 ["frisk" is "patdown for weapons"].) The *Terry* standard for a frisk applies to both drivers and passengers in a traffic stop. (*Pennsylvania v. Mimms* (1977) 434 U.S. 106, 111-112 (*Mimms*) [driver]; *Johnson*, at p. 327 [passenger].)

The United States Supreme Court first applied *Terry, supra*, 392 U.S. 1, to a traffic stop in a case with facts very similar to those presented here. In *Mimms, supra*, 434 U.S. 106, police officers stopped a vehicle being driven with an expired license plate. An officer asked the driver to get out of the car, and when the driver complied, "the officer noticed a large bulge under [the driver's] sports jacket. Fearing that the bulge might be a weapon, the officer frisked [the driver] and discovered in his waistband a .38-caliber revolver loaded with five rounds of ammunition." (*Id.* at p. 107.) The Supreme Court had "little doubt" about the propriety of the search, because "[t]he bulge in the jacket permitted the officer to conclude that [the driver] was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat down.' " (*Id.* at pp. 111-112.) The Supreme Court therefore reversed the judgment of the Pennsylvania Supreme Court, which had erroneously ruled the " 'revolver was seized in a manner which violated the Fourth Amendment.' " (*Id.* at pp. 106-107.)

The People correctly contend *Mimms, supra*, 434 U.S. 106, is controlling. Like the officer in *Mimms* who "noticed a large bulge under [the driver's] sports jacket" when the driver exited a vehicle during a traffic stop (*id.* at p. 107), St. Mars "observed a bulge in [Boget's] left front coat pocket" after he got out of a vehicle during a traffic stop. The officer in *Mimms* feared

the bulge could be a weapon, frisked the driver, and discovered a revolver. (*Ibid*.) Similarly here, the words and actions of St. Mars documented in his written report of the traffic stop clearly indicate he was concerned the bulge in Boget's coat pocket could be a weapon, even though St. Mars did not expressly so state in the report. After seeing the bulge, St. Mars immediately asked Boget whether he had any weapons and, despite his denial, touched the coat pocket and found knives. On these facts, we think the same "legitimate and weighty" concern for "the safety of the officer" that justified the "limited search for weapons" in *Mimms* justified St. Mars's frisk of Boget. (*Id*. at pp. 110, 111.)

Boget argues *Mimms, supra*, 434 U.S. 106, is not controlling because, unlike in that case, "[h]ere, there is no description of the bulge or any indication that the officer believed that the bulge meant [the detainee] was armed and presently dangerous." Boget further argues that extending *Mimms* to cover the facts of this case, as the People urge, would subject "*anyone* with *anything* in their pocket," including something "that is clearly the size and shape of a cellphone, a pack of gum, sunglasses, keys, or a wallet[,] . . . to a pat down search solely because the benign object causes a bulge in their clothing." We are not persuaded.

Concluding the frisk here at issue was permissible under *Mimms*, *supra*, 434 U.S. 106, does not lead to a rule that observation of *any* bulge in the clothing of a person detained during a traffic stop justifies a frisk for weapons. To be permissible under the Fourth Amendment, a frisk requires facts and reasonable inferences from the facts that support a reasonable suspicion the person to be frisked is armed and dangerous. (*Johnson*, *supra*, 555 U.S. at p. 327; *Mimms*, at pp. 111-112; *Terry*, *supra*, 392 U.S. at p. 27.) Because the object of a frisk is discovery of items that could be used to attack

9

the detaining police officer, to support reasonable suspicion bulges in clothing must be consistent with "guns, knives, clubs, or other hidden instruments" that could be used as weapons. (*Terry*, at p. 29; see *Ybarra v. Illinois* (1979) 444 U.S. 85, 93-94 ["Nothing in *Terry* can be understood to allow . . . any search whatever for anything but weapons."].) A bulge "that is *clearly* the size and shape of a cellphone, a pack of gum, sunglasses, keys, or a wallet," as Boget hypothesizes, would not seem to qualify. (Italics added.)

For a bulge in clothing to justify a frisk, however, it is not required, as Boget suggests, that the officer describe the bulge as " 'large' " and expressly state a fear or belief the bulge might be a weapon. The *Mimms* court attached no special significance to the size of the bulge in concluding the police officer's belief it might be a weapon justified the frisk. (*Mimms*, *supra*, 434 U.S. at pp. 111-112.) And, as we previously explained, although St. Mars did not write in his report that he suspected the bulge he saw in Boget's coat pocket was a weapon, the immediate questioning of Boget about weapons and touching of his coat pocket clearly indicate St. Mars's concern Boget might have been armed and dangerous. *Mimms* requires no more to justify the frisk. (See *United States v. Robinson* (4th Cir. 2017) 846 F.3d 694, 700 ["The only evidence of Mimms' dangerousness was the bulge indicating that he was armed."]; *United States v. Allen* (9th Cir. 1980) 675 F.2d 1373, 1383 ["a noticeable bulge in [a detainee's] pocket . . . provided reasonable suspicion for the officers to conduct a frisk"]; *People v. Brown* (1985) 169 Cal.App.3d 159, 165 (*Brown*) [police officer's observation of bulge under detainee's jacket in location where weapons are commonly carried justified frisk under *Mimms*].)

Boget faults the People for "ignor[ing]" in their writ petition *People v. Pantoja* (2022) 77 Cal.App.5th 483, which he describes as "recent, relevant caselaw" supporting the superior court's order on the suppression motion.

We disagree with that description. In *Pantoja*, a police officer frisked a driver during a traffic stop and found a loaded revolver in the driver's waistband concealed under a hoodie. (*Id.* at pp. 486-487.) At the suppression motion hearing, the officer testified there was " 'a good possibility or chance' " the driver might be armed and dangerous, in part because " '[h]e was wearing baggy clothing.' " (*Id.* at p. 487.) The officer further testified " '[t]he hoodie naturally has bulges in it,' " but in his written report the officer "did not mention any bulges in [the driver's] clothes." (*Ibid.*) The trial court ruled the baggy clothing did not support a reasonable suspicion the driver was armed and dangerous, and the Court of Appeal affirmed. (*Id.* at pp. 488, 490, 493.) Here, by contrast, St. Mars in his report did mention a bulge in Boget's coat pocket, and the immediate questioning of Boget about weapons clearly indicates St. Mars suspected the bulge might be a weapon. And unlike the driver's clothing in *Pantoja,* nothing in the record here suggests Boget's clothing, described simply as a "nylon jacket," had natural bulges. Moreover, *Pantoja* did not cite *Mimms*, *supra*, 434 U.S. 106, which we must follow. (*Brown*, *supra*, 169 Cal.App.3d at p. 166.)

In sum, because St. Mars's frisk of Boget for weapons did not violate the federal Constitution (*Mimms*, *supra*, 434 U.S. at pp. 108, 111-112), the superior court erred by suppressing evidence obtained as a result of the frisk (*Lance W.*, *supra*, 37 Cal.3d at p. 879; *Roberts*, *supra*, 68 Cal.App.5th at pp. 81-82; *Brown*, *supra*, 169 Cal.App.3d at p. 166). This conclusion makes it unnecessary for us to decide whether the illegality of the frisk so tainted Haber's questioning of Boget in jail that his statements must be suppressed as "fruit of the poisonous tree," as Boget contends, or whether the passage of time and intervening events so attenuated any taint that the statements need not be suppressed, as the People contend. Both contentions proceed

11

from the erroneous premise the frisk was illegal.  Because none of the evidence against Boget was tainted by a search or seizure that was unreasonable under the Fourth Amendment, none of it should have been suppressed.

## III.

## DISPOSITION

Let a writ issue commanding the superior court, immediately upon receipt of the writ, to vacate its order granting in part Boget's motion to suppress evidence and to enter a new order denying the motion in its entirety.


IRION, J.

WE CONCUR:



McCONNELL, P. J.



BUCHANAN, J.

12